Filed 11/26/08          NO. 4-08-0218

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Estate of PATRICK FALLOS,      )    Appeal from
a Disabled Person,                        )    Circuit Court of
PATRICK FALLOS,                           )    Macon County
          Petitioner-Appellant.           )    No. 05P310
                                          )
                                          )    Honorable
                                          )    Albert G. Webber
                                          )    Judge Presiding.
_____

JUSTICE COOK delivered the opinion of the court:

Patrick Fallos, a physically disabled man born in 1949, filed a petition to terminate guardianship over his person. The trial court denied the petition. Fallos appeals. We reverse and remand with directions.

## I. BACKGROUND

Fallos was born in 1949. Fallos was born into what he describes as "the average American family." His father worked for a gas company and his mother was a homemaker. Fallos graduated from high school with a "C+" average but with straight "A's" in the industrial arts and began to work various jobs in the service industry. For example, Fallos worked as a painter and as a United States mail carrier. At one point, he served as the vice president of a local union. Fallos later married and had two children, a boy and a girl. He and his wife divorced in 1980. Fallos' relationship with his children, particularly his

daughter, has since become strained.

Four years later, in 1984, Fallos was in a serious car accident that left him partially paralyzed, semi-spastic, and confined to a wheelchair. Fallos also suffered partial paralysis of his diaphragm, which made it extraordinarily difficult for him to speak and to be understood. Fallos now has a mechanical device that amplifies the sound of his voice, though others still have a difficult time making out his words. Fallos can, however, communicate with others through writing, as he still has use of one hand. His handwriting is shaky but legible. Nothing in the record indicates that the accident led to a diminishment of Fallos' cognitive abilities. After an initial recovery period following the accident, Fallos lived at home for over 20 years with the help of in-home care providers. Fallos supported himself with his monthly social security disability benefits.

Most recently, the Department of Rehabilitation Services (DORS) helped Fallos carry out his daily living functions. However, at some point in 2005, DORS ceased services because of allegations, which Fallos denies, that Fallos made sexual advances toward DORS employees. In October 2005, after DORS discontinued services, Fallos fell from his wheelchair and was unable to move or call for help. He was not found for three days, at which point he was taken to the hospital and treated for a fractured hip and dehydration. Fallos also suffered from

delusions during this time period, which may have been due to his failure to receive any nourishment during the days following his fall. For example, Fallos believed he had been kidnapped by "chop-shop" personnel and held at ransom for three days before being dropped off at his apartment to die. According to a hospital report written soon after the fall and dated October 6, 2005, Fallos also stated that he had been kept in a box for five days without food or water and that he had previously worked for Tom Brokaw. Fallos was also unable to remember three simple words after a five-minute delay and was unable to use his hands for writing, wiping his eyes, holding a glass, or manipulating the hospital bed. The hospital contacted Fallos' son, Jeff, who lived in Mundelein, Illinois. Jeff expressed concern for his father but also had concerns about the financial obligations that might come with further involvement.

Based on Fallos' state of being after the fall, the hospital psychologist recommended that Fallos be placed under guardianship. On October 19, 2005, Catholic Charities filed a petition for temporary guardianship. 755 ILCS 5/11a-4, 11a-8 (West 2004). That same day, the trial court adjudicated Fallos a disabled person pursuant to section 11a-2(a) of the Probate Act of 1975 (Act), which states that a person is disabled where, "because of mental deterioration or physical incapacity[, he] is not fully able to manage his person or estate." 755 ILCS 5/11a-

2(a) (West 2004). The court placed Fallos in the temporary guardianship of Catholic Charities. 755 ILCS 5/11a-4 (West 2004). The court also appointed attorney Rodney Forbes to serve as Fallos' guardian ad litem (GAL). 755 ILCS 5/11a-10(a) (West 2004).

On October 25, 2005, Catholic Charities filed a petition for plenary guardianship. 755 ILCS 5/11a-3, 11a-8 (West 2004). On November 29, 2005, the trial court held a hearing on the matter. 755 ILCS 5/11a-11 (West 2004). GAL Forbes recommended that the petition be granted, and the court appointed Catholic Charities to be Fallos' plenary guardian pursuant to section 11a-3(a)(1), which states that the court may appoint the disabled person a guardian of his person if, because of his disability, he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person. 755 ILCS 5/11a-3(a)(1) (West 2004). The court gave Catholic Charities the authority to place Fallos in a nursing home or other health-care facility if it determined such care to be necessary or to be in Fallos' best interest. Catholic Charities placed Fallos at Sullivan Health Care nursing home (Sullivan). According to GAL Forbes, Fallos did not initially object to the guardianship because he agreed that he needed to be placed in a licensed-care facility so that he could recover.

Nearly a year later, on October 13, 2006, Fallos sent a

- 4 -

handwritten note of correspondence to the trial court. In the letter, Fallos asked that the court take note of the progress he had made with his handwriting, which was once again legible with some effort on the part of the reader. Fallos complained that Catholic Charities was not doing a good job as guardian and stated that Sullivan was a "small central IL farm town care center [that is], I'm sorry to say, not well educated in DISABLED INDEPENDENCE." Fallos asked the court to understand that, prior to his "5[-]day NIGHTMARE" he had been living independently for 20 years and was able to participate in activities within the disabled community such as electric-scooter racing.

Based on this letter, the trial court scheduled a status hearing pursuant to section 11a-20(b), which governs the procedure to be followed where a ward requests that the guardianship order be terminated, revoked, or modified. 755 ILCS 5/11a-20(b) (West 2004). The court reappointed Forbes as GAL. On November 17, 2006, Forbes met with Fallos at the court's request to determine the import of Fallos' October 13, 2006, letter. Forbes submitted a three-page report, stating that it did not appear that Fallos' physical condition had significantly improved. However, Forbes did not observe any indication that Fallos suffered from any mental infirmity. Fallos did not have any specific complaints about the care he was receiving at Sullivan, except that he did not receive adequate physical

therapy to help him regain his strength.  Fallos stated that the reason he wrote the letter was because he wanted the court to appoint him an attorney to assist him in applying for services through DORS so that he could eventually be placed in a less restrictive environment.  Fallos asked to be present at any court hearing relating to his guardianship.

Forbes then spoke with administrators at Sullivan and at Catholic Charities, and both indicated that Fallos had previously exhausted in-home care resources due to inappropriate sexual comments and activity directed at the staff.  The Sullivan administrator stated that Fallos did not take full advantage of the physical-therapy programs Sullivan offers.  Forbes recommended that guardianship be continued until such time that Fallos secures a care provider such as DORS and regains the strength he had prior to the fall.

On December 5, 2006, after several continuances, the trial court conducted the status hearing.  As stated in a docket entry, the court found that Fallos was not asking that guardianship be removed and by its finding simply maintained the status quo.  However, the docket entry does not indicate Fallos' attendance at the hearing, even though he had earlier informed GAL Forbes that he would like to be present.

On April 11, 2007, April 26, 2007, and May 7, 2007, Fallos sent several handwritten notes of correspondence to the

trial court. This court notes that Fallos' handwriting seems to have improved since the October 13, 2006, letter. In the letters, Fallos indicated that his physical condition was no worse than it was prior to the fall, noting that he had always only had the use of one hand. Fallos claimed the State was soon to give him a new $10,000 voice device. Fallos requested that he be given a more workable wheelchair, to which "any mechanically inclined person could easily adapt." Fallos stated: "I don't want to be a system VICTIM. Isn't there anything you can do *** to speed up my reinstatement process[?]" Fallos expressed a desire to be served by DORS again and repeatedly noted that he had exhibited "no sexual misbehavior practices" while at Sullivan. Although he did not believe it was necessary, Fallos indicated a willingness to submit to a psychological examination if that is what it would take to speed the process along. Fallos again expressed his dissatisfaction with Sullivan, complaining that several of the nursing assistants had criminal records, the facility was understaffed, and two male residents had deliberately hit him. Fallos wondered why he hadn't been given any "disabled living options" other than Sullivan. Fallos also expressed a dissatisfaction with Catholic Charities, but he was vague as to his reasons. At one point, Catholic Charities apparently asked Fallos whether he would prefer that guardianship be transferred to his son Jeff, but nothing seems to have come of

this.

Based on the content of these letters, the trial court scheduled another status hearing.  Several continuances followed.  Then, on July 5, 2007, Fallos, through his court-appointed attorney, filed a petition to terminate guardianship pursuant to section 11a-20.  755 ILCS 5/11a-20 (West 2004).  The petition stated that Fallos had the capacity to perform the skills necessary to care for his person and manage his estate.  A hearing on the petition took place on December 21, 2007.

At the hearing, an agent for Catholic Charities testified that Fallos had actually been declining in his abilities in the year preceding the fall.  Catholic Charities had been monitoring Fallos' case during that time.  As of the time of the hearing, Catholic Charities was unable to find an appropriate care facility that would be less restrictive than Sullivan.  Catholic Charities contacted DORS, which said that Fallos needed more help than DORS could give.  Catholic Charities was not aware of any group home that would be a good fit for Fallos.  Catholic Charities stated that Fallos had sufficient coordination to work a television and DVD player and could walk very short distances if standing against a wall for support.  However, Fallos was not capable of feeding himself or of addressing daily hygiene needs.  According to Catholic Charities, Fallos still seemed to hold deluded beliefs regarding the time period surrounding his 2005

fall.  For instance, Catholic Charities was under the impression that Fallos still believes he was kidnapped.

GAL Forbes testified that he last met with Fallos six months prior to the hearing.  Forbes stated that Fallos appeared "very sharp" with the exception that he had an unrealistic perception of his abilities.  When asked whether guardianship should be terminated if Fallos had unlimited financial resources, Forbes evaded the question.  Forbes feared that if guardianship were terminated, Fallos would end up on the floor of his apartment again.

Fallos had his attorney read a statement to the trial court, which was similar in content to the above-mentioned letters.  Fallos additionally asserted that the State would pay for five hours of assistance per day should Fallos be allowed home.  In closing, Fallos' attorney noted the absence of case law concerning mentally sound yet physically disabled individuals who have sought termination of guardianship.  Fallos' attorney argued that Forbes' fears of Fallos again winding up on the floor of his apartment were unfounded.  Fallos' attorney stated that if guardianship were terminated, Fallos would not wheel himself out of Sullivan and return to an empty house.  Instead, the onus would simply be on Fallos himself to arrange for the proper home care or to find a setting other than Sullivan to meet his needs.  Fallos' attorney appreciated that Catholic Charities was acting

according to what it believed to be in Fallos' best interests but reminded the court that Fallos was "not a child."

In closing, Catholic Charities noted it believed the standard to terminate guardianship was whether termination would be in the best interests of the disabled person. Catholic Charities asserted that a disabled person was "someone who [is] unable to make and communicate responsible decisions for [his] care that affects [his] daily living activities." The GAL stated, "Unless there is some evidence that [the] disability has been discontinued, it's our recommendation that the guardianship continue."

The trial court stated it would take the matter under advisement. It wanted to take time to read Fallos' most recent psychiatric report. The court expressed empathy for Fallos' situation and noted that it was apparent that Fallos was able to communicate, though with some difficulty, with his attorney during the proceedings and "fully comprehend[ed] the nature and purpose of [the] proceedings." The court stated it would consider Fallos' best interests and also consider what situation would give Fallos the maximum amount of freedom, and it would balance those interests to the extent they were competing. As a final matter, GAL Forbes informed the court that should it deny Fallos' petition to terminate guardianship, guardianship would most likely be transferred from Catholic Charities to the office

of the State Guardian.

The most recent psychiatric report that the trial court referenced seems to have been taken in response to Fallos' doctor's concern that Fallos suffered from depression. In the report, Fallos indicated to the psychiatrist that he had an inability to manipulate the muscles to blow his nose and often becomes choked while trying to speak. The psychiatrist reported that Fallos had "average" intellectual functioning. During the examination, Fallos repeatedly stated that he was "normal" and "not stupid," and the psychiatrist assured him that his intellectual functioning was not in doubt. Fallos did not exhibit clinical depression, but frequently reported feeling "lonely" or "blue." Also according to the report, Fallos appeared to respond positively when someone took the time to listen and endure the difficulties associated with his poor speech. When asked about an incident where Sullivan's social services director noticed that Fallos appeared to have been crying, Fallos responded, "I'm human." Fallos had some "delusions of persecution" in that he spoke negatively about the care provided by the nursing assistants, his brother and sister, and DORS. Fallos still believed his initial hospitalization following the 2005 fall was due to his being abducted. He believed that the government lied to him. Fallos had unrealistic expectations as to what he would be able to handle physically.

After considering the evidence at hearing and the evidence contained in the psychiatric report, the trial court denied Fallos' petition to terminate guardianship. The court stated in a docket entry:

"The respondent obviously is subject to profound physical limitations. He is almost entirely dependent on a wheelchair, and has very limited use of his extremities. His speech is indistinct and barely audible, which is a source of frustration. His ability to live independently is nil--the respondent is reliant on others to assist him in all of his basic needs. The nub of the problem here is that the respondent remains intellectually vigorous. He is subject to the limitless pain of having an intact mind in a broken body. This has led to the respondent underestimating the severity of his physical limitations and overestimating his ability to live independently. The result of this was a reason for the establishment of this guardianship--the respondent had discharged his caretakers, and then apparently fell in his apartment and was discovered days later

***.  Guardianship is proper for *** reasons

of either mental or physical disability.  The

conditions necessitating guardianship are

still present today as they were in 2005.  No

physician has certified otherwise."

On January 17, 2008, Fallos filed a motion to reconsider.  Fallos noted that the trial court incorrectly stated that Fallos had discharged his caretakers, implying that Fallos did not believe he needed them.  In fact, DORS caretakers chose to discontinue services.  As such, it was not Fallos' unrealistic perception of his physical abilities that led to his fall.  Fallos asserted he did not need a guardian because he was capable of obtaining and arranging the care that he needs to live at home as he had previously.  In the alternative, Fallos asked the court to modify the guardianship so that he could move to a less restrictive facility than Sullivan.  The court took the matter under advisement, during which time the office of the State Guardian replaced Catholic Charities as the guardian.

On March 10, 2008, the trial court denied Fallos' motion to reconsider.  The court noted Fallos believed the court to have misinterpreted the facts in that Fallos did not discharge DORS but rather was abandoned by them.  However, the court believed that the circumstances surrounding the fall nevertheless demonstrated that Fallos was incapable of self-care and an

objective appreciation of the extent of his disabilities. Fallos, through his pro bono attorney, Timothy Tighe, filed the instant appeal. No party filed a brief in response.

## II. ANALYSIS

Fallos attacks his continued status as a ward on statutory grounds, arguing that guardianship is not proper at all and, in the alternative, that the trial court has given the guardian in this case too much authority over Fallos' person. In regard to the existing plenary guardianship, Fallos' particular complaint is that it does not allow for Fallos to be placed in the least restrictive environment.

### A. Development of the Law Regarding Guardianship for Physically Disabled Adults

Case law regarding guardianship for adults who are only physically disabled is exceedingly scarce. Rarer still are cases where, as here, the physically disabled adult disputes the need for guardianship. In 1979, the Illinois legislature amended the Probate Act to add section 11a, entitled "Guardians for Disabled Adults." In re Estate of Mackey, 85 Ill. App. 3d 235, 237, 406 N.E.2d 226, 229 (1980), citing Ill. Rev. Stat. 1978 Supp., ch. 110 1/2, pars. 11a-1 through 11a-23. The original version of section 11a-3 stated that guardianship was appropriate where "'a disabled person[,] *** because of his disability[,] *** lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person'" but did

- 14 -

not yet state the degree of certainty with which the trial court must find this to be true (i.e., clearly and convincingly). Mackey, 85 Ill. App. 3d at 237-38, 406 N.E.2d at 229, quoting Ill. Rev. Stat. 1978 Supp., ch. 110 1/2, par. 11a-3(a); compare 755 ILCS 5/11a-3(a) (West 2004) (including the clear and convincing standard). Even so, the Mackey court noted that the language contained in section 11a-3 was "a considerable refinement and development over the previous provision *** which merely defined an incompetent as one 'incapable of managing his person or estate.'" Mackey, 85 Ill. App. 3d at 238, 406 N.E.2d at 229, quoting Ill. Rev. Stat. 1977, ch. 110 1/2, par. 11-2. The new section clarified that, although a person may be disabled in the statutory sense of not being fully able to manage his person, a disabled person still could direct others in such activity and therefore would not necessarily need a guardian over his person. Mackey, 85 Ill. App. 3d at 238, 406 N.E.2d at 229-30, citing In re Estate of McPeak, 53 Ill. App. 3d 133, 136, 368 N.E.2d 957, 960 (1977).

Plenary guardianship is not appropriate where the respondent is capable of "intelligently direct[ing]" others to perform tasks for him. McPeak, 53 Ill. App. 3d at 136, 368 N.E.2d at 960. To appoint a plenary guardian, the trial court must find that the disabled adult is "'totally without capacity'" as specified in section 11a-3. Mackey, 85 Ill. App. 3d at 238,

406 N.E.2d at 230, quoting Ill. Rev. Stat. 1978 Supp., ch. 110 1/2, par. 11a-12(b); see also 755 ILCS 5/11a-12(b) (West 2004). A person could be completely paralyzed and in need of 24-hour care over his person, yet, if he could intelligently direct others concerning the care of his person, plenary guardianship would not be appropriate. See Mackey, 85 Ill. App. 3d at 238, 406 N.E.2d at 229-230, citing McPeak, 53 Ill. App. 3d at 136, 368 N.E.2d at 960. On the other hand, if the disabled adult lacks "'some but not all of the capacity as specified in [s]ection 11a-3, the court shall appoint a limited guardian.'" (Emphasis added.) Mackey, 85 Ill. App. 3d at 239, 406 N.E.2d at 230, quoting Ill. Rev. Stat. 1978 Supp., ch. 110 1/2, par. 11a-12(c); see also 755 ILCS 5/11a-12(c) (West 2004). As such, the 1979 provisions "envisage[d] and direct[ed] a careful look into the extent and nature of any disability and a tailoring of guardian-ship to the requirements and abilities of the individual, with the purpose of encouraging self-reliance and independence." Mackey, 85 Ill. App. 3d at 239, 406 N.E.2d at 230. This goal permeates a number of the provisions in section 11a. Mackey, 85 Ill. App. 3d at 239, 406 N.E.2d at 230; see also 755 ILCS 5/11a-3(b), 11a-9, 11a-11(e), 11a-12(c), 11a-14.1, 11a-17(a) (West 2004).

Since Mackey and the enactment of section 11a, under which the instant case is governed, the court in In re Estate of

<u>Galvin</u>, 112 Ill. App. 3d 677, 445 N.E.2d 1223 (1983), set forth some guidance as to just how difficult it is to establish that a respondent completely lacks the ability to make or communicate responsible decisions regarding the care of his person, such that he would need a plenary or even a limited guardian. In <u>Galvin</u>, the respondent suffered a series of strokes that left him with a weak right side and in need of a walker. The respondent's other physical disabilities included advanced arthritis and congestive heart failure. The respondent could die if he did not take his heart medication as prescribed. The strokes also left the respondent somewhat confused and delusional. For instance, the respondent believed he had invented the snowmobile and could produce fire by pointing his finger. The respondent also did not believe he had a heart condition, although he stated he continued to take his heart medication. <u>Galvin</u>, 112 Ill. App. 3d at 678-79, 445 N.E.2d at 1223-24. The appellate court endorsed the following comments by the trial court in affirming the trial court's refusal to appoint any sort of guardian to the respondent:

> "'There is no way in God's world that I
> am going to adjudicate him a disabled person.
> He is physically suffering from some disabil-
> ity. *** He is eccentric *** but there is no
> way I am going to adjudicate him in need of a

- 17 -

guardian. *** He lives a bizarre, strange life.  I might not want to do it, but unless you can make an offer of proof that is going to show me that he does not understand the things he's doing--.  He understands.'"  Galvin, 112 Ill. App. 3d at 679-80, 445 N.E.- 2d at 1224.

Similarly, the court in In re Estate of Bennett, 122 Ill. App. 3d 756, 461 N.E.2d 667 (1984), provided guidance as to when it might be appropriate to appoint a limited, rather than a plenary, guardian.  In Bennett, a wife filed a petition request- ing that she be appointed plenary guardian over her husband, who had been disabled by a stroke and subsequent brain surgery.  The husband's mother and sister cross-petitioned, requesting that one or both of them be appointed limited guardian.  Bennett, 122 Ill. App. 3d at 757-58, 461 N.E.2d at 668.  The respondent in Bennett had a speech impediment, had difficulty writing and walking, and experienced lapses in memory.  However, the trial court deter- mined that, when provided with the necessary information, he was able to make a responsible decision.  The court held that the respondent was disabled but was "not incapable of knowing what he wants to do.  He merely needs assistance."  Bennett, 122 Ill. App. 3d at 762, 461 N.E.2d at 671.  As such, the court found that limited guardianship was more appropriate than plenary guardian-

ship, as the intent of the statute in appointing a guarding is to provide the respondent with as much authority to guide his person as possible in terms of his condition. Bennett, 122 Ill. App. 3d at 762, 461 N.E.2d at 671, citing Ill. Rev. Stat. 1981, ch. 110 1/2, par. 11a-3(b).

A final development of note is the legislature's 2004 amendment to section 11a-3 regarding the appointment of a guardian to specify that the ward's inability to make or communicate decisions regarding the care of his person must be proven by "clear and convincing" evidence, creating a relatively high standard to appoint a guardian. See Pub. Act 93-435, §5, eff. January 1, 2004 (2003 Ill. Laws 3019, 3019-20) (amending 755 ILCS 5/11a-3 (West 2002)).

B. As Applied to the Instant Case

Typically, the moving party in a petition to terminate or modify guardianship has the burden to show that the existing order of guardianship should be terminated or modified. The standard is whether the ward's capacity to perform the tasks necessary for the care of his person or the management of his estate has been demonstrated by clear and convincing evidence. 755 ILCS 5/11a-20(a) (West 2004). However, the ward's "capacity to perform the tasks necessary for the care of his person or management of his estate" (755 ILCS 5/11a-20(a) (West 2004)) does not mean the ward must literally and physically have the capacity

to care for himself, wash himself, feed himself, move himself, *et cetera*. Rather the phrase, "capacity to perform the tasks necessary for the care of his person or management of his estate," includes the ward's "sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person." 755 ILCS 5/11a-3(a) (West 2004). Any contrary interpretation of the phrase, "capacity to perform the tasks necessary for the care of his person or management of his estate," would lead to inconsistencies within the Act concerning what type of person is subject to plenary or limited guardianship, depending upon whether a guardianship was being put in place for the first time or whether it was being modified at a later date.

The record shows by clear and convincing evidence that Fallos is not "totally without capacity" to direct others concerning the care of his person. This much is clear from Fallos' ability to communicate his wishes in letters to the court, the most recent psychological report (which stated that Fallos was of average intelligence), and the trial court's observations: "[Fallos] remains intellectually vigorous" and "is subject to the limitless pain of having an intact mind in a broken body." As in *Galvin*, whether we agree with Fallos' decisions or not, "'he *** understand[s] the things he's doing.'" *Galvin*, 112 Ill. App. 3d at 680, 445 N.E.2d at 1224. As in *Bennett*, Fallos is "not

- 20 -

incapable of knowing what he wants to do." Bennett, 122 Ill. App. 3d at 762, 461 N.E.2d at 1224.

Plenary, or absolute, guardianship is not appropriate for Fallos, and the existing order for plenary guardianship should at the very least be modified to be a limited guardianship aimed at fitting Fallos' unique situation. Again, the Act "envisage[d] and direct[ed] a careful look into the extent and nature of any disability and a tailoring of guardianship to the requirements and abilities of the individual, with the purpose of encouraging self-reliance and independence." Mackey, 85 Ill. App. 3d at 239, 406 N.E.2d at 230.

We acknowledge that Fallos' attorney did not request with precision the specific remedy of remand for modification from plenary to limited guardianship. However, Fallos' attorney has argued throughout this case that existing plenary guardian- ship is not appropriate given Fallos' improved condition. Fallos' attorney also argued, beginning with his motion to reconsider, that the guardianship be modified so that Fallos could be placed in a less restrictive facility. For these reasons, we have the authority to remand as described above.

As a final point of discussion, we note that the unique circumstances of this case make it almost unfair to place the burden on Fallos to demonstrate the need to terminate or modify guardianship. The initial guardianship order was put in place

during Fallos' lowest state of cognitive functioning following an injury that left him without nourishment and delirious. Though his physical state improved very little if at all in the years following the fall, he seemed to have regained a great deal of mental capacity (compare the hospital report dated October 6, 2005, to the most recent psychological report in the record). In 2005, the trial court appointed a plenary guardian based on what ended up being a temporary mental state and energy level. In regard to Fallos' state of being after his recovery from the fall, the trial court never made the specific finding that Fallos, as a result of his disability, clearly and convincingly lacked sufficient understanding to direct others concerning his care and was totally without capacity in that regard.

### III. CONCLUSION

For the aforementioned reasons, we reverse the trial court's judgment and remand for the court to modify the plenary guardianship as directed.

Reversed and remanded with directions.

TURNER, J., concurs.

MYERSCOUGH, J., dissents.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent. I am firmly convinced we should affirm. The ward has failed to establish by clear and convincing evidence his capacity to perform the tasks necessary for the care of his person or the management of his estate. The court specifically stated in its decision "guardianship is proper for reason of either mental or physical disability. 755 ILCS [5/11a-2(a) (West 2004)]. The conditions necessitating guardianship are still present today as they were in 2005. No physician has certified otherwise." Moreover, both the ward's attorney and his GAL agreed the wardship should continue.

The physical disability alone is sufficient for wardship under the statute. However, this gentleman additionally suffers delusional thinking and has an unrealistic perception of his abilities.

> "Although the client is clearly in a diffi-
> cult position as he is rendered to his wheel
> chair and has difficulty speaking audibly,
> due to the partial paralysis of his dia-
> phragm, he does not appear to be realistic
> regarding his physical capabilities. Client
> often becomes choked while speaking, adding
> to his difficulty to converse. He also re-
> ported substantial embarrassment regarding

- 23 -

his tendency to cough during conversation. An evaluation by his primary care physician also indicated client's unrealistic view of his physical capabilities. Overall, client appears to hold delusional beliefs about his past and present treatment and is having extreme difficulty adjusting to life in his current environment."

The court was correct: it had to factually decide removal of disability, and the placement in the ward's best interests, giving him maximum freedom. Here the disability was not removed so the court did not go on to address best interests. The issue here is whether <u>the</u> <u>ward</u> has established by clear and convincing evidence his capacity to perform tasks necessary for his care. The ward's attorney, GAL, and the court concurred the ward had not done so. The evidence at the hearing establishes:

"Catholic Charities: ward cannot live independently, needs 24 hour care, cannot feed himself, perform normal hygiene, walk without assistance, hard for him to vocalize, delusional thinking.

GAL: unrealistic perception of his abilities, recommend guardianship remain, incapable of caring for himself physically on his

own."

For these reasons, the trial court should be affirmed.