NOTICE
Decision filed 08/29/17. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2017 IL App (5th) 160129

NOS. 5-16-0129, 5-16-0132, 5-16-0292 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF | ) | Appeal from the Circuit Court of |
| MARYLOU KUSMANOFF, | ) | St. Clair County. |
| an Alleged Disabled Adult | ) | |
| | ) | No. 15-P-246 |
| (Carol Easterley, Petitioner- | ) | Consolidated with |
| Appellee; Lynda Burgett, | ) | No. 15-CH-313 |
| Counterpetitioner-Appellant; | ) | |
| Michael Burgett, Interested | ) | |
| Person-Appellant; and MaryLou | ) | Honorable |
| Kusmanoff, Respondent- | ) | Stephen P. Rice, |
| Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Overstreet concurred in the judgment and opinion.

**OPINION**

¶ 1    These three appeals, concerning the guardianship of the person and estate of MaryLou Kusmanoff, were consolidated in this court for the purposes of oral argument and decision.[1] In the first appeal, MaryLou's son, Michael Burgett, and his wife, Lynda Burgett, appeal the March 4, 2016, order of the circuit court of St. Clair County, which adjudged MaryLou to be a disabled adult pursuant to section 11a-2 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-2 (West 2014)) and appointed MaryLou's daughter, Carol Easterley, as guardian over her person

_____

[1]We note that MaryLou's guardianship case was consolidated in the circuit court with a chancery case involving the freezing of MaryLou's assets during the pendency of the probate proceeding. The chancery case is not a subject of any of the three appeals disposed of herein.

and estate.[2] In the second appeal, MaryLou also appeals the circuit court's order adjudging her to be a disabled person and appointing Carol as the guardian over her person and estate. Both of these appeals are taken pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Feb. 26, 2010). In the third appeal, MaryLou appeals, pursuant to Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)), the circuit court's June 21, 2016, order, which denied her motion to take judicial notice of a Texas judgment finding that a guardianship of her person and estate is not required and to terminate the circuit court's adjudication of her disability.

¶ 2     The issues presented by the three appeals are whether the circuit court (1) had jurisdiction to enter the plenary guardianship order pursuant to the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (Guardianship Jurisdiction Act) (755 ILCS 8/101 *et seq.* (West 2014)), (2) erred in its adjudication of MaryLou's disability, (3) erred in appointing Carol plenary guardian over MaryLou's person, (4) erred in appointing Carol plenary guardian over MaryLou's estate, and (5) erred in denying MaryLou's motion to take judicial notice of the Texas judgment and to terminate the adjudication of disability. For the reasons that follow, we reverse, without remanding, that part of the circuit court's March 4, 2016, order that found that MaryLou requires a guardian of her person. We affirm that part of the circuit court's order that found that MaryLou requires a guardian of her estate. We vacate the remainder of the circuit court's order and remand to the circuit court for the limited purpose of holding an evidentiary hearing in which the circuit court appoints a corporation pursuant to section 11a-5(c) of the Probate Act (755 ILCS 5/11a-5(c) (West 2014)) as guardian of MaryLou's estate and imposes any limitations on that guardianship that should be imposed based on MaryLou's actual mental,

---

[2]In their briefs, Michael and Lynda also appeal from orders entered on March 1, 2016, and March 8, 2016, which enjoined them from (1) participating in a proceeding in Texas regarding the guardianship of MaryLou, (2) removing MaryLou from Mount Moriah Nursing Home in Texas, and (3) taking any action regarding MaryLou's real or personal property or accounts. For reasons to be set forth below, this court does not have subject-matter jurisdiction with respect to these orders at this time.

physical, and adaptive limitations as set forth in sections 11a-3(b) and 11a-12(a) and (b) of the Probate Act (755 ILCS 5/11a-3(b), 11a-12(a), (b) (West 2014)), with reference to the duties of a guardian of the estate that are set forth in section 11a-18 of the Probate Act. 755 ILCS 5/11a-18 (West 2014). In addition, we instruct the circuit court that, should MaryLou so choose, she be permitted to be absent from the hearing pursuant to section 11a-11(a) of the Probate Act (755 ILCS 5/11a-11(a) (West 2014)) and that her testimony be procured through electronic or other means as set forth in section 106 of the Guardianship Jurisdiction Act. 755 ILCS 8/106 (West 2014). Finally, due to a superseding petition to terminate the guardianship, we find any issue regarding the circuit court's failure to rule on MaryLou's April 13, 2016, petition to terminate the guardianship is moot but point the circuit court to section 11a-20 of the Probate Act (755 ILCS 5/11a-20 (West 2014)) and the standards set forth therein for considering MaryLou's petition to terminate and note that, in light of our opinion, MaryLou's petition to terminate should only be adjudicated as it pertains to the guardianship of her estate.

¶ 3                                    FACTS

¶ 4      The facts necessary to our disposition of these three consolidated appeals are as follows. On April 17, 2015, Carol filed two petitions in the circuit court of St. Clair County. The first petition requested that MaryLou, born December 31, 1931, be adjudged a disabled adult pursuant to section 11a-2 of the Probate Act (755 ILCS 5/11a-2 (West 2014)) and that Carol be appointed a temporary guardian of her person and estate pursuant to section 11a-4 of the Probate Act. 755 ILCS 5/11a-4 (West 2014). In her petition to be appointed a temporary guardian, Carol alleged that MaryLou resided in Belleville, had a personal estate of approximately $750,000, is a disabled adult incapable of managing her person or estate, and had been the victim of fraud and abuse. On that same date, the Honorable Christopher Kolker entered an *ex parte* order adjudging

3

MaryLou to be a disabled person as defined in section 11a-2 of the Probate Act (755 ILCS 5/11a-2 (West 2014)) and appointing Carol as temporary guardian over MaryLou's person and estate for a period of no longer than 60 days. There is no report of proceedings as to any hearing on Carol's petition for a temporary guardianship. The second petition Carol filed on April 17, 2015, is a petition requesting that she be appointed the plenary guardian of MaryLou's person and estate pursuant to section 11a-3 of the Probate Act.[3] 755 ILCS 5/11a-3 (West 2014).

¶ 5    On April 24, 2015, Carol filed a chancery case, which was later consolidated with the instant probate case, in which she requested, as temporary guardian over MaryLou's estate, a temporary restraining order enjoining the release of any of MaryLou's funds from Amoco Federal Credit Union (Amoco) in Texas. A temporary restraining order was subsequently entered, and on May 4, 2015, the parties agreed to extend that temporary restraining order until such time as Carol's petition for a plenary guardianship over MaryLou was adjudicated.

¶ 6    On May 8, 2015, MaryLou filed a motion to vacate the circuit court's April 17, 2015, order appointing Carol as temporary guardian of her person and estate. In her motion to vacate, MaryLou argued that the circuit court erred in adjudging her to be disabled without any expert evidence and without a physician's report as required by section 11a-9 of the Probate Act. 755 ILCS 5/11a-9 (West 2014). In addition, MaryLou averred that she has interests opposed to Carol, disputes that she is disabled or in need of guardianship protection, would nominate someone other than Carol to act as her guardian if such need did arise, and believes that Carol has acted contrary to her financial interests or in violation of fiduciary duties to MaryLou in the past.

¶ 7    On May 18, 2015, Carol filed a response to MaryLou's motion to vacate and a request for a medical evaluation of MaryLou. In the response to MaryLou's motion to vacate, Carol averred

---

[3]Although the second petition contains a scrivener's error requesting that Carol be appointed a temporary, rather than plenary, guardian over MaryLou's person and estate, Carol was later granted leave to amend the petition by interlineation to request plenary guardianship.

4

that the temporary guardianship was based on Carol's claim that MaryLou was a victim of fraud or abuse. Carol averred that her brother, Michael Burgett, moved MaryLou from the State of Illinois "sometime after March 11, 2015," and transferred the majority of MaryLou's assets to his personal accounts in Texas. Carol attached a report from Dr. John Magner, from Cahokia Health Center, dated December 31, 2014, wherein Dr. Magner diagnosed MaryLou with end-stage dementia and stated that she was severely disabled and required 24-hour daily custodial care. However, the record indicates that Carol later withdrew this report, and it was never introduced as evidence in any subsequent proceeding on Carol's petition.

¶ 8    On May 29, 2015, Carol filed a motion to extend her temporary guardianship over MaryLou's person and estate, stating that the guardianship needed to be extended in order to allow time for MaryLou to be examined by a physician and for a hearing date to be secured on the matter of her competency. In response to Carol's motion, MaryLou averred that she was a resident of St. Paul's Nursing Home in Belleville in February 2015 and that Carol came to the nursing home and demanded she sign a document, which MaryLou refused to sign. MaryLou further averred that she understood the import of the document to be a power of attorney or other authorization to allow Carol access to MaryLou's assets. According to MaryLou's response, upon her refusal to sign the documents, Carol told MaryLou she was "done with her" and left the nursing facility and never returned. MaryLou averred that she then contacted her son, Michael, in Texas, and asked that he assist her in obtaining discharge from St. Paul's and relocate her to live near him in Texas, including directing him to collect her bank accounts for safekeeping. Finally, MaryLou stated that she would consent to be evaluated as to cognitive capacity by a qualified physician of her choosing.

¶ 9    MaryLou attached a physician's report from Dr. Jerome Carolino, a board-certified family medicine doctor and medical director of Mount Moriah Health and Rehabilitation Center, where MaryLou was then residing in Texas. This report was contained in a sealed envelope with no indication that it had ever been opened prior to this court's examination of the record. According to this report, MaryLou was able to give a coherent explanation of her legal situation and expressed a desire to be in Texas with her son. Dr. Carolino found MaryLou was awake; fully alert; oriented to time, space, place, and name; and generated a passing score on the Mini Mental Status Exam. The report concluded that MaryLou is competent to manage her estate and make proper decisions for herself.

¶ 10    On June 1, 2015, the circuit court entered an order vacating its adjudication of disability but denying MaryLou's motion to vacate Carol's guardianship over MaryLou's person and estate. In addition, the order stated that "temporary appointment of guardian of person/estate is extended for a period of 120 days from 4-17-15."[4] The circuit court further ordered MaryLou to submit to an evaluation pursuant to sections 11a-9 and 11a-10 of the Probate Act (755 ILCS 5/11a-9, 11a-10 (West 2014)), to be conducted by Dr. James Vest, a physician selected by Carol. On July 1, 2015, the Honorable Stephen P. Rice was assigned to the case, and unless otherwise noted, entered all orders subsequent to that date.

¶ 11    On July 6, 2015, MaryLou filed another physician's report, authored by Dr. Jung-Hoon Kim, a board-certified geriatric physician in Texas. This report was also contained in the record in a sealed envelope with no indication that it had ever been opened prior to this court's examination of the record in conjunction with this appeal. According to this report, Dr. Kim examined MaryLou on June 10, 2015. In this report, Dr. Kim opined that MaryLou had some

---

[4]This court takes judicial notice that August 15, 2015, was 120 days from April 17, 2015. See *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 901 (1990) (judicial notice may be taken on matters of common knowledge, including calendar days).

difficulty with ambulation due to left leg pain and fine motor deficit due to left carpal tunnel syndrome but was in otherwise good physical shape. Dr. Kim found MaryLou to be fully oriented cognitively, able to explain the legal proceedings and her move to Texas without assistance from Michael, admitted to some short-term memory loss, and scored in the mild cognitive impairment range on the St. Louis University Mental Status Exam (SLUMS). Dr. Kim found this assessment to be consistent with the normal aging process but did recommend regular follow-up, as 10% of persons with mild cognitive impairment do enter into dementia. However, Dr. Kim opined that MaryLou did not require a guardian.

¶ 12    Carol prepared a notice of bench trial on July 21, 2015, notifying the parties that her petition for plenary guardianship was set for bench trial beginning on August 3, 2015. On July 22, 2015, MaryLou filed a motion to continue the trial, stating that Carol set the bench trial without consulting with MaryLou. In addition, MaryLou averred that she had never received a copy of a physician's report from Dr. Vest, who examined MaryLou on June 29, 2015. MaryLou expressed a desire to depose Dr. Vest.

¶ 13    On August 6, 2015, Carol filed a motion to extend her temporary guardianship over MaryLou's person and estate. According to this motion, the case had recently been assigned to the Honorable Stephen P. Rice, and the parties had been unable to agree on a trial date at which all could appear. The motion states that the temporary guardianship was set to expire "on or about August 17, 2015," and that "there is no objection to the extension of the temporary guardianship as stated in the motion herein." The motion requests that the temporary guardianship be extended "up and through September 30, 2015, or until [the] [c]ourt rules on the guardianship petition filed in this case, whichever is sooner." On August 12, 2015, an order titled "Agreed Order" was entered by the Honorable Stephen P. McGlynn, which states "[o]n motion

7

of [Carol], this court extends the temporary guardianship of the person and estate of [MaryLou] to September 30, 2015." There is no report of proceedings of any hearing on this motion to extend the temporary guardianship. Without explanation, and also with no report of proceedings of record, an order titled "Order," rather than "Agreed Order," was entered by the Honorable Vincent J. Lopinot on August 14, 2015, also stating that "on motion of [Carol], this [c]ourt extends the temporary guardianship of the person and estate of [MaryLou] to September 30, 2015."

¶ 14 On August 24, 2015, Carol filed a notice of bench trial notifying the parties that the bench trial on her petition for plenary guardianship was set to begin on September 16, 2015. On September 3, 2015, Michael's wife, Lynda, filed a verified counterpetition, requesting that she be appointed the limited guardian of MaryLou's person and estate. In the counterpetition, Lynda averred that MaryLou was residing with her in Broaddus, Texas. Lynda averred that a limited guardianship of MaryLou's person and estate would be beneficial as MaryLou retains sufficient capacity to attend to her person and estate with assistance.

¶ 15 On September 16, 2015, the date on which Carol had sent notice that the bench trial on her petition for plenary guardianship was set to commence, the circuit court entered an order appointing Greg Skinner as guardian *ad litem* for MaryLou, setting the case for "status" on October 6, 2015, and ordering that "the temporary guardianship is extended until further order of the court."[5] There is no report of proceedings of record to explain what transpired prior to the entry of the September 16, 2015, order.

¶ 16 On October 6, 2015, Carol's petition for plenary guardianship was set for hearing on December 2 and 3, 2015. On December 2, 2015, the circuit court attempted a mediation of

---

[5]Attorney C.J. Baricevic was initially appointed guardian *ad litem* for MaryLou and filed an interim report on September 16, 2015.

Carol's petition for a plenary guardianship, which was unsuccessful. On December 3, 2015, Carol began her case-in-chief, beginning with the presentation of the testimony of her daughter, Samantha Bierman. Samantha testified to a close relationship between herself, her parents, Carol and Ken, and MaryLou and her late husband Samuel. She testified that Carol, Ken, and herself (the Easterleys) provided assistance to MaryLou and Samuel prior to Samuel's death in 2012. Following Samuel's death, MaryLou stayed, for approximately one year, on the farm they had shared, with the Easterleys assisting her as needed. According to Samantha, MaryLou's son, Michael, did not attend Samuel's funeral and rarely visited from Texas.

¶ 17 Samantha testified that MaryLou moved to a villa in Belleville in 2013 and Samantha lived within three minutes of MaryLou's villa. She was available to assist MaryLou 24 hours a day, 7 days a week, and visited two to three times a week. Samantha testified that in the summer of 2014, MaryLou had a series of falls. Samantha also began to notice some forgetfulness on MaryLou's part. During this time, MaryLou also underwent surgery for carpal tunnel release. At this point, the family began discussions regarding placing her in a care facility for temporary rehabilitation. MaryLou then moved into Rosewood Care Center in Swansea. In December 2014, MaryLou was hospitalized for bronchitis and urinary tract infection. She was discharged to St. Paul's Senior Community due to her dissatisfaction with Rosewood. At the time of her transfer to St. Paul's, Samantha characterized MaryLou's condition as weak, exhausted, and suffering from periods of confusion. Samantha testified that she visited MaryLou regularly at St. Paul's until approximately one week prior to MaryLou leaving for Texas.

¶ 18 Samantha testified as to a series of gifts she received from MaryLou. First, she testified that MaryLou wrote her a check for $10,000 for her wedding. Second, MaryLou purchased a $5000 fence for Samantha in exchange for her and her husband power washing and staining her

fence. Third, MaryLou gave Samantha $3000 to $4000 for a move to Boston that never came to fruition. Finally, MaryLou purchased a Ford Explorer for Samantha for approximately $40,000.

¶ 19    On cross-examination, Samantha testified that she was aware of Michael visiting MaryLou at the farm sometime after Samuel's death. Samantha also testified that some of the money for the Ford Explorer was transferred from MaryLou's account by Carol as power of attorney for MaryLou. Also, the purchase of the Ford Explorer occurred in 2014, at a time that Samantha testified MaryLou's forgetfulness was beginning to rise to a level of concern. Samantha also testified that she had no real knowledge of interactions between MaryLou and Michael, that she did not talk to MaryLou about her intention of leaving for Texas, and that MaryLou understood and made her own decision regarding each move she made prior to leaving for Texas. Finally, Samantha testified that she had no conversations with MaryLou regarding her wishes as they pertain to Carol's petition for guardianship and had no contact with MaryLou since she left for Texas.

¶ 20    Imogene Harrell testified she is the retired director of nursing for St. Paul's Senior Community and has a personal recollection of MaryLou as a resident there. She characterized MaryLou as a nice lady who likes to talk and vacillated regarding her desire to be in residence at St. Paul's. Imogene testified that she recalls that MaryLou had episodes of confusion during her time at St. Paul's, wherein she insisted there were items of furniture in her room that were never brought there or she forgot that she had her daily bath. Imogene testified that Carol was visiting MaryLou at St. Paul's on almost a daily basis and was very involved in her care. She also testified that she observed MaryLou interact with Michael on one occasion and thought MaryLou seemed intimidated by him. Finally, she testified that Michael was impolite to staff when he visited St. Paul's on that occasion.

10

¶ 21    On cross-examination, Imogene agreed that the conditions at St. Paul's are old and dilapidated. She testified that MaryLou was always oriented to time and place and that she was capable of having intelligent, adult conversations and communicating her needs to staff. MaryLou also voluntarily participated in her care by engaging in physical rehabilitation. In addition, Imogene testified that she does not recall seeing Samantha visiting with MaryLou at St. Paul's.

¶ 22    Following Imogene's testimony, the circuit court expressed concern that the bench trial would not be completed by the end of the day. After hearing from counsel, the circuit court stated that it would be necessary to set aside three days to finish the case "sometime in the future." The circuit court explained that due to a shortage of judges and a judicial conference to take place in early February, there would be no way to reconvene the trial until "March or late February." MaryLou's counsel expressed concern regarding MaryLou traveling from Texas during the winter months. At this point the following colloquy between the circuit court and MaryLou occurred:

"THE COURT: So realistically we're looking at March or late February. Or is that too cold?

MARYLOU: Yes, sir, it is.

THE COURT: [MaryLou], I respect your wishes.

MARYLOU: I'm sorry. I'm not happy. I don't understand. I've done the right thing all the way through this li[f]e. It is my money. What rights do I have?

THE COURT: I'm trying to ensure your rights, ma'am. I'm doing the best I can.

MARYLOU: It's—She's putting me in the grave.

11

THE COURT: Ma'am, all I'm asking you: Would you prefer March rather than February?

MARYLOU: Do I have any choice?

THE COURT: I'm asking you what your preference is.

MARYLOU: March I guess.

THE COURT: March it is.

MARYLOU: Now, don't decide to take me up real quick."

¶ 23    Following this discussion, Sandra Rochen testified that she worked at Tempo Bank in Trenton, where MaryLou and Samuel's farm had been located. She met MaryLou as a customer of the bank, and they became friends. She described MaryLou as a fun, nice, and sweet person and testified that she would always gush about the Easterleys and how they did everything for her. Sandra testified that she was present at the bank when MaryLou came in to close her account, accompanied by Michael and Lynda. According to Sandra, MaryLou told her she was going to Texas with Michael "for a couple of months" but would return. Sandra testified that Michael seemed agitated during the transaction, and she was concerned that MaryLou was closing her account in the amount of $51,000 when she planned to return. Sandra testified that she was unsure that MaryLou knew what was going on with regard to the transaction and expressed concern to her supervisor. However, Michael had a power of attorney dated March 11, 2015, and the supervisor said that the transaction could not be stopped.

¶ 24    On cross-examination, Sandra testified that she personally only saw MaryLou on a few occasions at the bank and their relationship consisted mostly of telephone conversations. She testified that MaryLou always directed her financial transactions at Tempo Bank, calling ahead of time to let Sandra know what transaction she desired. She learned from MaryLou over the

years that Michael was a busy executive, had lots of money, multiple residences, had married six times, and did not visit often. He also suffered the tragic loss of his adult son in an explosion. MaryLou had both Carol and Michael on her accounts at Tempo Bank, in addition to the March 2015 power of attorney Michael brought in. Sandra testified that she was sad MaryLou was not coming back to Illinois and that she observed MaryLou's memory slipping toward the end of her contact with her because she asked for something multiple times. Finally, Sandra testified that Tempo recognized MaryLou at all times as being capable of conducting her financial affairs.

¶ 25    Keri Scheibel testified that she is a physical therapist at St. Paul's and worked with MaryLou at St. Paul's on wheelchair mobility, transfers from her wheelchair, and general strengthening. While the initial goal of therapy was independence, and MaryLou progressed well, she still needed standby assistance for transfers from her wheelchair at the time she was discharged from therapy in February 2015. Twenty-four-hour care was recommended for MaryLou due to her being prone to falls. Keri testified that she did witness periods of confusion and short-term memory loss in MaryLou. Keri testified that Carol was very involved in MaryLou's care at St. Paul's and that they had a good relationship except when MaryLou said she wanted to go home and Carol wanted her to stay.

¶ 26    On cross-examination, Keri testified that MaryLou made it very clear she did not want to be at St. Paul's. She testified that MaryLou was always cooperative in therapy and able to communicate her desires. Keri herself personally observed two instances of short-term memory loss. However, during speech therapy, staff administered the SLUMS assessment, on which MaryLou scored a 13/30, which indicates moderate deficits in cognitive functioning. Keri testified that these scores can improve on retesting.

¶ 27    Charlene Brennan testified she is a real estate broker and an acquaintance of Carol. Carol hired her to find a home for MaryLou closer to family when she was ready to move from the farm in 2013. The villa that was ultimately purchased for MaryLou was modified to accommodate her mobility needs. MaryLou approved of the villa and indicated to Charlene that she wanted Carol to have full power of attorney with respect to the real estate transaction because her son was not there and Carol was and she wanted Carol to handle everything. Charlene testified that she had prepared paperwork to include Michael's name on the title but MaryLou instructed her to put it in her and Carol's names only. She determined these were MaryLou's wishes based on a brief conversation she had with MaryLou with no influence from Carol. The villa was purchased per warranty deed titled in the name of MaryLou and Carol as joint tenants with right of survivorship. Charlene testified that she had no concerns about MaryLou's capacity to make decisions with respect to the transaction at that time. Following Charlene's testimony, the evidence was closed for the day and the parties were instructed to agree to dates to continue the trial in March.

¶ 28    At the end of the December hearing, a discussion was held regarding the circuit court authorizing funding from MaryLou's estate to pay for her care and expenses. Counsel for Michael and Lynda informed the court that at that time MaryLou was staying at Mount Moriah nursing home during the week and at a cabin with Michael and Lynda on the weekend. In addition, the circuit court was informed that MaryLou planned to move back to the cabin full time as soon as possible. Over Carol's objection, the circuit court ordered that MaryLou be given $1000 a month over the social security income she was receiving. The parties began to discuss discovery issues, at which time the circuit court indicated, "I'm tired. I'm tired," followed by MaryLou's statement, "So am I." At the very end of the proceeding, the following transpired:

14

"MARYLOU (to Carol): You don't call me. I don't ever want to talk to you again.

THE COURT: [MaryLou]—

MARYLOU: Is that—

THE COURT: [MaryLou]—

MARYLOU: You're not my daughter anymore.

LYNDA: Mom.

MARYLOU: No. You're not my daughter anymore.

THE COURT: [MaryLou], you're not helping yourself.

MARYLOU: She's a liar.

THE COURT: Ma'am—

MARYLOU: She's a liar.

THE COURT: Ma'am,

MICHAEL: Mom, stop.

LYNDA: Stop.

MARYLOU: I'm sorry. I've been—

THE COURT: Ma'am—

MARYLOU:—fine all my life. I supported myself. Never asked anybody for anything. This is my money. Nobody else's.

MICHAEL: Mom.

THE COURT: Ma'am, you're not helping yourself.

MARYLOU: I'm sorry. I hear all everybody else says. I don't have anything to say.

15

MICHAEL: Mom, stop.

THE COURT: I guarantee you[,] you will get your say, ma'am.

MICHAEL: You'll get your day.

MARYLOU: Begin to wonder the law's all one-sided. My, gosh. The more honest you are the more—Very disappointed. Very disappointed."

¶ 29 Finally, the circuit court noted on the record that no exhibits had been introduced or admitted up to that point in the proceedings. Carol's counsel indicated that she would keep all of the exhibits in a box at her office until the proceedings resumed.

¶ 30 On December 22, 2015, on Carol's motion, and over MaryLou's objection, the circuit court ordered that MaryLou be required to continue her residence at Mount Moriah nursing home in Texas until the bench trial was to reconvene on March 1, 2016, rather than to relocate to Lynda and Michael's home in Texas. On February 22, 2016, MaryLou filed a motion to quash Carol's Illinois Supreme Court Rule 237 (eff. July 1, 2005) notice to compel her attendance at trial and set the motion for an emergency hearing. In her motion, MaryLou stated that prior to these proceedings, in March 2015, she left a residential care facility in Illinois in order to move to the State of Texas to live with her son. MaryLou stated that from when she left Illinois to move to Texas in March 2015, she intended to reside in Texas and was then a resident under Texas law. MaryLou expressed a fear that if she appeared at the March 1, 2016, hearing, the circuit court and/or Carol would require her to live in Illinois, when it was her desire to remain in Texas. On February 23, 2016, the circuit court entered an order denying MaryLou's motion to quash her required appearance.

¶ 31 On February 26, 2016, MaryLou filed a motion to dismiss Carol's petition for plenary guardianship. In her motion to dismiss, MaryLou again stated that, on or about March 9, 2015,

16

she left Belleville, Illinois, and moved herself and her possessions to Texas with the assistance of her son Michael. At the time she left Illinois, MaryLou asserted that she intended to complete physical rehabilitation at a care facility in Texas and then to move into a residence on property owned by Michael in Texas. MaryLou stated that in connection with her decision to relocate to Texas, she asked her son to assist her in transferring her money from banks in Illinois to Amoco Federal Credit Union in Texas. According to her motion to dismiss, MaryLou had returned temporarily to Illinois on two occasions for the purposes of attending the proceedings on Carol's petitions and had continuously resided in Texas up to the time of her motion to dismiss.[6]

¶ 32    MaryLou asserted in her motion to dismiss that Carol's temporary guardianship over her could only be extended under Illinois law 120 days past the entry of the initial order granting Carol temporary guardianship over her, pursuant to section 11a-4 of the Probate Act. 755 ILCS 5/11a-4 (West 2014). MaryLou calculated this time limit to have expired as of October 17, 2015.[7] MaryLou stated that she has dispossessed herself of any real estate interest in Illinois and submitted to the jurisdiction of the Texas courts as to guardianship over her estate in proceedings filed in Texas on or about February 26, 2016. MaryLou asserted that as a result of the guardianship proceedings filed in Texas, there are proceedings in more than one state as to her guardianship, triggering the Guardianship Jurisdiction Act. 755 ILCS 8/101 *et seq.* (West 2014). MaryLou argued that pursuant to the Guardianship Jurisdiction Act, Texas had acquired jurisdiction over her guardianship proceeding, and she requested that the circuit court dismiss Carol's plenary guardianship petition.

---

[6]While this court recognizes that MaryLou's pleadings were unverified and thus their averments are not evidentiary in nature, we set forth the contents of the pleadings for the purpose of providing context.

[7]As previously noted, this court takes judicial notice that the time period actually expired on August 15, 2015.

17

¶ 33    On March 1, 2016, Carol filed a response to MaryLou's motion to dismiss. On the same date, Michael and Lynda filed motions to quash Carol's Rule 237 notices to compel their appearance at the remaining portion of the bench trial, which was set to proceed on that date. Counsel for MaryLou was present as well as counsel for Michael and Lynda. However, MaryLou, Michael, and Lynda were not present. The circuit court denied MaryLou's motion to dismiss, finding that Illinois retained subject-matter jurisdiction over Carol's petition for plenary guardianship over MaryLou. Counsel then orally renewed his motion to quash Carol's Rule 237 notice to compel MaryLou's attendance at the hearing, which the circuit court denied. MaryLou's counsel then requested leave to withdraw, stating that MaryLou had instructed him to terminate his representation of her in the instant proceedings should her motion to dismiss be denied. The circuit court denied the motion to withdraw, but MaryLou's counsel ceased participation in the proceedings at that point.

¶ 34    Several written orders were entered on March 1, 2016, before the bench trial continued. First, the circuit court entered, over MaryLou's objection, another order stating that Carol's temporary guardianship over MaryLou is continued and extended through the time that the court determines the need for a permanent guardian. Second, the circuit court entered an order restraining MaryLou, Michael, and Lynda from proceeding in the guardianship action in Texas. Additionally, the circuit court enjoined MaryLou, Michael, and Lynda from taking any further action or participating in any legal proceeding in any jurisdiction other than St. Clair County, Illinois, concerning issues of probate or guardianship, involving the person or property of MaryLou.[8] The circuit court announced that it planned to call the Texas judge as a courtesy to inform him of the injunction it had issued against the parties participating in the Texas

---

[8]The circuit court also entered an order on March 8, 2016, enjoining Michael and Lynda from taking MaryLou from the Mount Moriah nursing home in Texas for any reason or taking any action with respect to MaryLou's real or personal property or accounts.

18

proceeding. The circuit court made it clear that it was not calling the Texas judge under the auspices of section 209 of the Guardianship Jurisdiction Act. 755 ILCS 8/209 (West 2014). Later that day, the circuit court confirmed that he contacted the Texas judge and informed him of the injunction that had been issued against the Texas proceeding.

¶ 35    Following the disposition of the various motions, Carol continued with her case-in-chief. C.J. Baricevic testified that he was appointed the guardian *ad litem* in this case shortly after it was filed in April 2015. He testified that at a hearing in September 2015, after he disclosed that he had received a campaign contribution from Carol's counsel's law firm, MaryLou objected to his being guardian *ad litem*, and he was replaced. Attorney Baricevic testified that prior to being replaced, he interviewed the parties and prepared a report that sets out the substance of those interviews. His testimony continued as that of a fact witness over objection of counsel for MaryLou, as well as counsel for Michael and Lynda, that he had been replaced as guardian *ad litem*.

¶ 36    Attorney Baricevic testified that he first interviewed MaryLou on June 29, 2015, and that MaryLou had difficulty telling him the amount of money that was in a bank account and the types of accounts in which the money was deposited. She did not recall the date of her husband's death, did not know exactly where she lived in Texas, and told him that she sold the house for "one and three hundred cents." She also had difficulty recollecting the time, place, and capacity in which she resided in an assisted living facility. Although it was attorney Baricevic's understanding that MaryLou had just come from her examination by Dr. Vest, MaryLou indicated that she had breakfast that day, had gone to see her lawyer, and was then with attorney Baricevic. She did not have a recollection of having seen a doctor and said she had been given a

clean bill of health by doctors she had seen in the past. She indicated that she does sometimes need assistance managing her money.

¶ 37    Attorney Baricevic testified as to his observations of an exchange between MaryLou and Michael in the waiting room after his first interview. He testified that although the entire conversation was not audible to him, it appeared that Michael appeared to ask MaryLou what questions attorney Baricevic had asked and condescendingly challenged MaryLou's answers. Attorney Baricevic was not able to be more specific regarding the substance of this conversation, and did not include it in his report for that reason.

¶ 38    Attorney Baricevic gave the following account regarding his discussion with Michael as to MaryLou's living arrangement at that time. Michael stated that MaryLou reached out to him and asked if she could live with him. Originally he told her that he did not think he would have room in his house. Later he discussed it with Lynda, and they agreed that MaryLou could live with them. MaryLou asked him to place money into his Amoco account because she was afraid Carol would steal the money. He also indicated that MaryLou stayed at Mount Moriah during the week and lived in the cottage at their house on the weekends because Michael was exhausted from driving MaryLou back and forth from Mount Moriah for rehabilitation services. Attorney Baricevic testified that this version of the living arrangement differed from that MaryLou provided in that MaryLou stated that she spent some days at Mount Moriah and with her son and his wife at nights, except occasionally when she has very early physical therapy the next day.

¶ 39 On cross-examination, attorney Baricevic testified that when he asked her where she preferred to live, MaryLou voiced a disdain for Carol and a preference to stay in Texas. When he asked her whom she preferred to assist her if she needed assistance with finances, she stated that she preferred Michael and Lynda. In addition, she indicated a preference that Carol not be

provided the opportunity to aid in that capacity. She described a fact pattern in which Carol was disrespectful to her over the later portion of their relationship in Illinois. However, she was vague as to details regarding this disrespect.

¶ 40    Jay Dowell testified that he is an attorney who is married to Carol's stepdaughter. He has known MaryLou for 28 years, and their families were very close. He acted as MaryLou's attorney for the 28 years prior to MaryLou leaving for Texas. He testified to the relationship Carol had with MaryLou prior to Sam's death and after, stating that Carol and her husband Ken constantly helped them out on the farm prior to Sam's death and continued to help MaryLou thereafter, including the sale of the farm and the purchase and renovation of the villa. Attorney Dowell identified a power of attorney for property that MaryLou executed in June 2013, naming Carol as the primary power of attorney and Michael as successor, followed by Carol's daughter, Samantha. Attorney Dowell testified that he drafted this document in connection with the purchase and title for the villa and that it would be his practice to speak with a client about her wishes prior to drafting such a document. Attorney Dowell testified he only met Michael around four times.

¶ 41    Ken Easterley testified he has been married to Carol since 1979. He also testified to the closeness he, Carol, and Samantha had to MaryLou and Sam. He testified that he and Carol helped MaryLou and Sam clean out the buildings on the farm so that they could live there. Once the house was built, they spent a lot of time there with MaryLou and Sam. He testified that he had a close relationship to Sam and drove him to many appointments after he was diagnosed with cancer in 2011. Ken, Carol, and Samantha assisted with many of the chores around the farm during this time. Michael did not visit at all during this time and did not attend Sam's funeral in

21

2012. Prior to his death, Sam gifted his 2007 Trailblazer to Ken in return for his promise to take MaryLou anywhere she needed to go. He traded the Trailblazer in for a Jeep Cherokee.

¶ 42 Ken testified that for the year following Sam's death that MaryLou continued to live on the farm, they spent a lot of time at the farm assisting her. Ken kept his promise to Sam in that he continued taking MaryLou to her appointments. Toward the end of the time that MaryLou lived at the farm, she began having some difficulties with falls, and they purchased Lifeline for her. In 2013, they began discussing moving her closer to them, and MaryLou subsequently purchased the villa described in prior testimony. Ken testified that they moved MaryLou away from the farm, which was a very large chore. Regarding the purchase of the villa, Ken testified that MaryLou told him that she appreciated what everybody did and that she wanted Carol to have the villa. MaryLou was able to live independently in the villa for a year with help from Ken, Carol, and Samantha. They took her food, helped her bathe and wash her hair, shopped for her, and took her to appointments.

¶ 43 Ken testified that, in October 2014, MaryLou fell and had to be hospitalized. Following the hospitalization, they made the decision that MaryLou needed to go into a nursing home for a while for rehabilitation. She entered Rosewood nursing home at that time. They moved her into Rosewood, and thereafter, St. Paul's. Toward the end of the time MaryLou was at St. Paul's, Carol received an IRS form in MaryLou's name from Amoco, which Carol did not recognize. However, Ken testified that he was aware of no argument between Carol and MaryLou prior to MaryLou leaving for Texas.

¶ 44 On cross-examination, Ken testified that he had not spoken to MaryLou since she left Illinois, and does not know of her current condition or if her needs are being met. He acknowledged MaryLou's gifts to Carol and Samantha, including the Ford Explorer to

22

Samantha, a Dodge Caravan to Carol, and the villa to Carol. Between the time Sam died and MaryLou ended up at St. Paul's, Ken did notice a decline in MaryLou's physical and mental health. Physically, she went from a cane, to a walker, to a wheelchair. Mentally, she began repeating herself during conversations, and this was a slow progression. He never talked to MaryLou about seeking independent advice regarding her estate or gifts to them. He became aware that MaryLou was leaving St. Paul's when he and Carol got a text from Michael that he was taking MaryLou to Texas. He has not attempted to contact her since. He never heard of an argument between Carol and MaryLou. It is his understanding that MaryLou moved from Rosewood to St. Paul's because she did not get along with some of the certified nursing assistants.

¶ 45    On March 2, 2016, the bench trial resumed. MaryLou, Michael, and Lynda did not appear, but their respective counsel each was again present. Carol moved to dismiss Lynda's petition for limited guardianship, which the circuit court granted. When Carol called her first witness of the day, counsel for Michael and Lynda objected, stating that all of the evidence Carol had been introducing was not relevant to the threshold issue of MaryLou's disability, and that no such evidence had been introduced up to that point. At that time, Carol moved to admit medical records from MaryLou's family physician in Illinois, Rosewood Care Center, St. Paul's Senior Community, and Mount Moriah in Texas. These records are tabbed such that red tabs reflect documentation of MaryLou having a fall and blue tabs represent periods of confusion or cognitive difficulties. Carol also moved to admit the evidence deposition of Dr. Vest. In response, Michael and Lynda's counsel moved to admit the evidence deposition of Dr. Kim. In addition, Michael and Lynda moved for a directed finding that Carol had not met her burden of proving that MaryLou is a disabled adult as defined in section 11a-2 of the Probate Act. 755

23

ILCS 5/11a-2 (West 2014). Counsel noted that while the medical records were relevant, no physician correlated any of the information presented by the records into a finding of disability in a physician's report or deposition. The circuit court took the motion under advisement and requested that Carol call her next witness.

¶ 46    Lori LeBlanc testified that she has been friends with Carol since 2008. She testified that she was present in court on December 3, 2015, and observed Lynda bringing MaryLou out of the courtroom and saying to MaryLou, "She will not be happy until you're in the grave." Following this testimony, Carol called MaryLou as a witness despite her absence. At that time, MaryLou's counsel again asked the circuit court that her presence be excused pursuant to section 11a-11(a) of the Probate Act. 755 ILCS 5/11a-11(a) (West 2014). A discussion was held regarding the implications of the motion, but the motion was never explicitly ruled upon.

¶ 47    Carol was the final witness to testify. She testified that Lynda made the statement to her in front of MaryLou in December that she thought Carol would rather see MaryLou in her grave. Carol testified that MaryLou and Sam's farm sold for over $1 million. MaryLou was always generous when it came to giving gifts. Carol testified to MaryLou's gifts of vehicles previously outlined in the testimony as well as all of the assistance she, Ken, and Samantha provided to MaryLou. Carol further testified that MaryLou paid $1100 for her to have laser surgery for plantar fasciitis in 2014. Carol testified that MaryLou told her she wanted Carol's name to be on the villa so that it would be hers when MaryLou passed away because of everything Carol and her family had done for MaryLou over the years.

¶ 48    Carol testified that during the course of the instant litigation she became aware that Michael had received gifts of money from MaryLou in 2014. She identified checks payable from MaryLou to Michael dated July 15, 2014, in the amount of $40,000, July 21, 2014, in the amount

24

of $30,000, and August 7, 2014, for $13,000, for a total of $83,000. Carol testified that she became concerned with MaryLou's memory and cognitive abilities in December 2014. Once MaryLou plateaued in physical therapy at St. Paul's, and it became apparent that MaryLou would be unable to effectuate transfers from her wheelchair without standby assistance, Carol began exploring options for assisted living or permanent placement at St. Paul's. She had also thought about getting care for MaryLou at the villa. She testified that Michael came to town around that same time period. Internet transfers from an Amoco account in the name of MaryLou and Michael jointly to Michael's personal Amoco account were identified from December 2014, totaling $40,000, occurring at a time when MaryLou was hospitalized. Carol testified that she then had a discussion with MaryLou about placing Carol's name on the joint Amoco account. They then requested this from Amoco and Amoco sent them paperwork to sign. Carol also testified that she found a document in MaryLou's handwriting showing that MaryLou had given Michael and Lynda $14,000 each as a Christmas gift that year. Carol testified to sporadic visits from Michael from the time Sam died until Michael took MaryLou to Texas in March 2015. She testified that though she and Michael did not have a good relationship, she kept Michael apprised of the status of MaryLou's health.

¶ 49    Carol testified that she became aware MaryLou had an account at Amoco in January 2015 when she received a tax form from Amoco in MaryLou's mail. She called Amoco but Amoco would not give her any information because her name was not on the account. When she discussed this with MaryLou, MaryLou did not know Michael's name was also on the account. MaryLou then told her if Michael's name was on the account, she wanted Carol's name on it as well. They then called Amoco to request the paperwork required to add Carol's name. Amoco sent this paperwork, and Carol forwarded it to Michael, but Michael never signed. At that point

Carol told MaryLou she would not have the finances to help her if she did not get Michael to sign paperwork to add her to the Amoco account. After she left that paperwork with MaryLou, Carol did not see MaryLou again before she left, although she called St. Paul's to inquire about her and make sure her needs were being met. She stayed away to allow MaryLou time to convince Michael to sign the papers. She then found out that Michael had checked MaryLou out of St. Paul's and stayed with her at the villa for about a week. Thereafter, she received a text that Michael was taking MaryLou to Texas. For these reasons, Carol did some research and discovered transfers that were made from MaryLou's accounts contemporaneous with her move with Michael to Texas.

¶ 50    As a result of her research, Carol discovered that three of MaryLou's accounts were closed, one account containing $314,846, a second containing $315,238.29, and a third containing $50.12. Carol testified that she did not close any of these accounts. An account was opened at a different bank in MaryLou's name only on December 19, 2014, with a deposit amount of $315,067.24. Carol identified a check written to Michael from that account and dated January 29, 2015, in the amount of $315,000, which was deposited into Michael's personal Amoco account. The check purports to contain MaryLou's signature, but Carol testified that in her opinion, based upon having assisted MaryLou with her financial affairs for years, the signature was not that of MaryLou. This is the same day that Carol called Amoco requesting paperwork to add her name. Carol also identified a quitclaim deed wherein MaryLou transferred her half of the villa to Michael on December 24, 2015.

¶ 51    Carol testified that she filed for guardianship of MaryLou because she wants to protect her. She is concerned that Michael is influencing MaryLou and that MaryLou really does not wish to live in Texas. It also concerned her that Michael took all of the money out of MaryLou's

26

name. Carol visited MaryLou at Mount Moriah in late November 2015. She testified that she had a nice visit with MaryLou. MaryLou was surprised to see her, and they only visited for 10 or 15 minutes. The nurse then came in and shortly thereafter Michael called. Michael then came to the nursing home calling Carol names and getting MaryLou upset. She also identified an exhibit showing all the phone calls she had made to try to contact MaryLou but testified she hardly ever got through. Carol testified that MaryLou told her she was living at Michael's and only going to Mount Moriah for therapy. However, Mount Moriah records indicate that she stayed there during the week.

¶ 52    Carol testified that she visited MaryLou again in January 2016 and had a good visit lasting over an hour and a half. Michael then called and said he and Lynda were going to take MaryLou to dinner, so the visit was again cut short. MaryLou also made statements indicating that she had no money to pay her bills, did not realize she had been given $1000 a month for personal expenses, and that the attorneys had advised her she would get into trouble for talking to Carol. Carol observed that MaryLou had "deteriorated quite a bit." She had no strength in her hands or legs and did not walk at all. She could not bathe or get herself dressed and needed help with toileting. She demonstrated disorientation, confusion, and short-term memory loss. Carol testified that she was ready, willing, and able to act as a guardian of the person and estate of MaryLou.

¶ 53    Following cross-examination of Carol, the circuit court inquired of Carol as to whether, prior to leaving St. Paul's, MaryLou had ever told her she hated her, had ever acted in a manner that would indicate that feeling, or ever expressed a desire to change any gift that she had made, to which Carol responded in the negative. The circuit court and the parties then finalized the admission of the vast amount of documentary evidence, including all of the medical records and

27

depositions of Dr. Vest and Dr. Kim, as previously outlined. Carol's counsel and Michael and Lynda's counsel then proceeded with closing arguments, which included Michael and Lynda's motion for directed judgment, in which it was argued that Dr. Vest's opinions and report were fatally flawed. At that time, the circuit court realized that he had not heard from the guardian *ad litem*, Gregory Skinner, and called him to the stand.

¶ 54    Attorney Skinner testified he met with MaryLou, Michael, and Lynda and reviewed the contents of the court file. With regard to his conversations with MaryLou, attorney Skinner testified he thought even from his initial conversations that she was in need of some assistance, especially with her financial matters. Attorney Skinner concluded that, after hearing the evidence which he characterized as basically coming from one side, there is no question that MaryLou needs a guardian and the petition should be granted. Because Carol's petition was the only petition pending, attorney Skinner testified that Carol should be named. Attorney Skinner also stated that if the circuit court felt that a third party would be appropriate to handle the money he would not really object to it and in fact he was an advocate for that when the case first started because "it seemed like a lot of the problems revolved around money." Upon further inquiry by Carol as to whether attorney Skinner objected to Carol acting as guardian of MaryLou's estate, attorney Skinner responded, "No, No. Not based on—I mean all the evidence that's been presented, there really isn't anything that shows a problem. It might have been different had there been another side presented. But that was not—that didn't happen." In response to Carol's question as to whether "there ought to be some form of residential placement allowed whether it be in Texas [or] here," attorney Skinner opined that there is going to have to be residential care. When asked whether MaryLou indicated to him anything about her relationship with Lynda, he

28

testified that they got along well and Lynda demonstrated a caring attitude toward MaryLou. However, attorney Skinner testified, "that is kind of off the table."

¶ 55    Without any break in the proceedings, the circuit court made specific findings of fact from the bench. He began by expressing opinions regarding the credibility of the witnesses. These witnesses, who the circuit court found to be credible, corroborated Carol's claim that MaryLou and Carol had a very long term relationship of frequent contact and that Carol and her family greatly aided MaryLou at various times and through various difficulties. With regard to MaryLou's disability, the circuit court stated the following:

> "Okay. I am 67 years old and I'm going through some of this stuff on a personal level with my in-laws. Not that I am using that in any way. But so you understand that I have an understanding of this. And I certainly indicated to [MaryLou] that I would certainly want my rights protected.[9] The older I get I know I'll be getting less and less cognitive. And I would want a court to vigorously preserve my right to make my own decisions. But I have to say this: In taking all of the testimony in its entirety and taking the consideration that your—concerns about the testimony of Dr. Vest—and I might as well say this too. When [MaryLou] made that outburst in the court it wasn't under oath but I think it is something that—that is evidentiary nonetheless in the sense that it is—I've been a judge for 16 years. I have never seen someone voice such a strong opinion that was full of contempt and full of venom."

¶ 56    After further commentary expressing the finding that Michael and Lynda have exerted influence over MaryLou and prevented Carol from having a relationship with her, as well as

---

[9]This is the second of two references the circuit court made on March 2, 2016, to having spoken with MaryLou in some capacity. However, there is no other indication from the record or briefs that any type of *in camera* interview of MaryLou by the circuit court actually occurred.

findings that the money transfers made by Michael in December 2014 and January and May 2015 were suspect, the circuit court continued:

"So getting back to the outburst by [MaryLou]. Quite frankly I was surprised [Carol's counsel] asked the open-ended question of [Carol] why she thought that [MaryLou] would attack her with such venom at the end of the proceedings that day. Here's my take on it. I don't think you have to be an expert to know that one of the symptoms if you will of Alzheimer's or dementia or dimunition of cognitive ability is a change in personality. And that's particularly true if as is the case here all of the contact [MaryLou] had from the time she left St. Paul's to the time that she appeared in court in December was exclusively under the care and control of [Michael and Lynda] with perhaps one brief interlude where [Carol] had contact with her mother. *** I think the most likely explanation for that is not just the frustration of being in court and it was a long day. It was at the end of the day. And people's cognition as mine right now tend to get a little more defective as the day goes on when you're tired and you've been listening to testimony all day. And I think that outburst was more—it shows something that was totally uncharacteristic of [MaryLou]. Now I had no contact with [MaryLou] prior to that day. So I'm not pretending I have knowledge of what kind of woman she is. I heard some testimony—I think it was the teller at the bank that in all of the transactions that she handled with [MaryLou] and many of the times I suppose [Carol, Ken, or Samantha] were there, [MaryLou] was a nice lady. The outburst that I heard there was not the outburst of that lady. I find it to be the outburst of someone different."

¶ 57    After finding that MaryLou was competent in 2012 when she made gifts of vehicles to Carol and her family, the circuit court found that "[MaryLou] is a disabled person under Illinois

law" and that the disability arose between December 2014 and January 2015. The circuit court found that MaryLou is incapable of forming the requisite cognition to make appropriate choices for making decisions about her person or her estate and that as a consequence of that incapacity she would be subject to undue influence. The circuit court instructed Carol's counsel to prepare a judgment consistent with the rulings he made from the bench and to "add such language as you believe the evidence supports to the extent it supports my ruling that you believe should be included in the judgment." The circuit court appointed Carol as the guardian of MaryLou's person and estate. Addressing Carol, the circuit court stated:

"The power of guardian of the person gives you the power to determine the residence of [MaryLou]. And I do this very reluctantly because I think [MaryLou] probably does like where she is in Texas. And perhaps I would like to be in Texas right now too. But in the succinct words of the Rolling Stones sometimes you don't get all—you don't always get what you want but you get what you need."

¶ 58    On March 4, 2016, the circuit court entered an order stating that Carol had proven by clear and convincing evidence that MaryLou is a disabled person due to mental deterioration and physical incapacity who is not fully able to manage her person and estate and lacks sufficient understanding to communicate decisions regarding the care of her person. The order concluded that MaryLou is a disabled person as defined in section 11a-2 of the Probate Act (755 ILCS 5/11a-2 (West 2014)) and that a limited guardianship will not provide sufficient protection for MaryLou or her estate. The circuit court appointed Carol plenary guardian of MaryLou's person and estate, granting Carol the power of residential placement pursuant to section 11a-14.1 of the Probate Act. 755 ILCS 5/11a-14.1 (West 2014). On March 31, 2016, Michael and Lynda filed a notice of appeal, and MaryLou filed a separate notice of appeal, from the March 4, 2016, order,

31

pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Feb. 26, 2010). These are the first two appeals that were consolidated before this court and are disposed of by this opinion.

¶ 59    On April 1, 2016, MaryLou filed a notice of filing of a foreign judgment. She attached an order, entered by the district court in San Augustine County, Texas, appointing Lynda as the temporary guardian of her person and estate. On April 5, 2016, the circuit court vacated the registration of the Texas order over MaryLou's objection. On April 13, 2016, MaryLou filed a motion to take judicial notice of foreign judgment and to terminate the adjudication of her disability. According to the motion, the district court in San Augustine County, Texas, entered an order on April 8, 2016, restoring full legal capacity to MaryLou. Based on this order, MaryLou requested that the circuit court terminate its adjudication of her disability pursuant to section 11a-20 of the Probate Act. 755 ILCS 5/11a-20 (West 2014). The motion further requested a hearing on the motion and that MaryLou be permitted to participate remotely in the hearing from her place of residence in Texas. On June 21, 2016, the circuit court entered an order denying the motion in all respects and stating that there is no just reason for delaying the enforcement or appeal, or both, of the order. On July 7, 2016, MaryLou filed, pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), a notice of appeal from that order, which is the third appeal that was consolidated before this court and is disposed of by this opinion.

¶ 60    On July 19, 2016, the circuit court entered an order stating the following: (1) the motion for directed finding and memorandum of law in support of the motion are deemed to have been filed on or before March 2, 2016; (2) the deposition transcript of Dr. Jung-Hoon Kim, taken on August 14, 2015, is deemed to have been filed of record on or before March 2, 2016; (3) the deposition transcript of Dr. James Vest is deemed to have been filed of record on or before March 2, 2016; (4) the motion for directed finding, memorandum in support of motion for

32

directed finding, and depositions of Dr. Kim and Dr. Vest shall be supplied to the clerk of the court by the parties within seven days of the entry of the order; (5) the clerk of the court shall prepare a supplement to the record on appeal that includes the documents identified by the order and a copy of the order; and (6) the court declares that the motion for directed finding and supporting memorandum of law, as well as the deposition transcripts of Dr. Kim and Dr. Vest, were considered by the court in connection with its prior orders and specifically in connection with the order entered on March 4, 2016. We will summarize the deposition testimony of Dr. Kim and Dr. Vest due to the import of this evidence to the issues on appeal.

¶ 61    Dr. Kim testified that he earned his fellowship in geriatric medicine from the University of Pennsylvania and is board certified in internal medicine and geriatrics. He is an assistant professor of geriatrics at Baylor College of Medicine. He testified consistently with his report, which was filed by MaryLou in July 2015 but apparently unopened. Although he found that MaryLou had mild cognitive impairment, he testified that this can be a symptom of the normal aging process and is not necessarily the first stage of a progressive dementia process. He suggested future assessments to monitor her progress in this area. The main symptom of MaryLou's impairment is forgetfulness in the form of repeated questions regarding short-term memory. Dr. Kim testified that MaryLou required limited physical assistance but was fully oriented and had good insight. On cross-examination, Dr. Kim agreed that MaryLou is not fully competent and that there are "some matters for which she cannot make sound decisions." In addition, Dr. Kim agreed that MaryLou may have difficulties managing a $750,000 estate.

¶ 62    Dr. Vest testified that he is a retired physician specializing in internal medicine. He operated a pulmonary lung clinic and so has experience treating older patients. He was referred to examine MaryLou by Carol's attorney and conducted his exam of MaryLou in MaryLou's

33

attorney's office. During his examination of MaryLou, he administered the Montreal Cognitive Assessment Exam (MOCA), which he opined is more in-depth than the SLUMS exam performed by Dr. Kim. During the deposition, Dr. Vest did not have the testing form he used when administering the MOCA and so was testifying as to his memory of MaryLou's performance on the specific components of the exam.[10] Dr. Vest testified that MaryLou scored a 13 on the MOCA, which indicates moderate dementia.[11] Dr. Vest testified that the symptoms of dementia can wax and wane but it is a progressive disease in which he would expect MaryLou's symptoms to worsen. Dr. Vest testified that MaryLou is incapable of managing her affairs due to impulsivity and memory loss and that she is susceptible to influence. He opined that she is also incapable of taking care of her personal needs due to her susceptibility to falls, inability to bathe, and forgetfulness regarding activities of daily living such as eating and taking her medication. Dr. Vest testified that any further testing regarding MaryLou's cognitive abilities would be unnecessary except to determine a course of treatment.

¶ 63     Dr. Vest's report is attached to his deposition but is not contained anywhere else in the record. The report contains MaryLou's age of 83 years and her date of birth. According to Dr. Vest's report, MaryLou stated that she had been married twice, was living in Texas with her son and daughter-in-law, and gets physiotherapy twice a day. Her physical exam was normal, although Dr. Vest noted she was sitting in a wheelchair in no acute distress. The report contains the results of the MOCA exam as follows: (1) alternating trail making-1/5, (2) naming-3/3, (3) memory delayed recall-0/5, (4) attention-1/6, (5) language-1/3, (6) abstraction-1/2, (7) orientation-6/6, total score-16/30. The report then provides the following summary:

---

[10]As detailed later, the record on appeal was ultimately supplemented with the form itself, on which it can be seen that the scores on the various components that Dr. Vest testified to during his deposition varied from those recorded on the actual form.

[11]As set forth below, Dr. Vest's report and the MOCA exam sheet reflect that MaryLou actually scored 16.

34

"In summary, [MaryLou] is an 83-year-old white female who has great recall for past events but has very poor short-term memory. The results of her [MOCA] were consistent with moderate dementia. It is my feeling based upon a recent [*sic*] degree of medical certainty that the patient requires guardianship based on the fact that her moderate cognitive impairment and physical incapacities due to previous events. Her moderate dementia will only continue to deteriorate in the future."

¶ 64    On cross-examination, Dr. Vest testified that he examined MaryLou with no one else present, as this is his practice. He testified that MaryLou was oriented to time and place. He testified that Carol's counsel's law firm has represented him in the past. This was his first time administering the MOCA. He conducted no testing regarding MaryLou's adaptive behaviors and no functional analysis of her ability to care for herself. He did not inquire into the medications MaryLou was taking or her current medical treatment. He asked her no questions directly assessing her short-term memory recall. He testified that MaryLou stated that she was happy in Texas. She exhibited no symptoms of moderate dementia other than the MOCA exam score. He stated no opinion on whether MaryLou is capable of expressing her preference of caregiver. He testified that he found no evidence of past impulsivity, irrationality, or a failure to attend to her affairs.

¶ 65    On October 24, 2016, the parties filed a stipulation to correct material omissions of the record on appeal with the following: (1) the MOCA scoring sheet used during Dr. Vest's evaluation of MaryLou; (2) Dr. Jerome Carolino's report, which MaryLou filed with the circuit court on May 29, 2015, but as previously addressed, this court found in a sealed envelope bearing no indication it had ever been opened; and (3) Dr. Kim's report, which MaryLou filed

35

with the court on July 9, 2015, but which, as previously addressed, this court found in a sealed envelope bearing no indication it had ever been opened.

¶ 66                                    ANALYSIS

¶ 67                          1. Appellate Jurisdiction Regarding Injunctions

¶ 68    Before addressing the issues on appeal, we note that Michael and Lynda include arguments in their brief addressing the circuit court's March 1, 2016, and March 8, 2016, injunctions, which prohibited them from proceeding in the Texas action, from removing MaryLou from the Mount Moriah nursing home in Texas, and from taking any action with respect to MaryLou's real or personal property and accounts. This court lacks the subject-matter jurisdiction to proceed with review of these orders at this time. On May 2, 2016, Michael and Lynda filed a motion to file a late notice of appeal from the injunctions under Illinois Supreme Court Rule 303(d) (eff. Jan. 1, 2015) in a fourth case, docketed as No. 5-16-0180. On May 31, 2016, this court entered an order denying the motion and dismissing that appeal.

¶ 69    In the instant case, Michael and Lynda's notice of appeal specifies that they are appealing, pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Feb. 26, 2010), the March 4, 2016, order of the circuit court which adjudged MaryLou disabled and appointed Carol as MaryLou's plenary guardian. Although the failure to pursue an immediate interlocutory appeal as of right does not forfeit the right to challenge the interlocutory order upon entry of final judgment (see *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11-12 (2001)), the instant appeal is not an appeal from a final judgment but rather an interlocutory appeal pursuant to Rule 304(b)(1). Furthermore, assuming this were an appeal involving a final judgment, Michael and Lynda did not include the March 1, 2016, and March 8, 2016, injunctions in their notice of appeal in the instant case, and there is no way to fairly infer from the notice of appeal that Michael and Lynda

36

intended to present the March 1, 2016, and March 8, 2016, injunctions for review as part of this appeal. See *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434 (1979) (an unspecified judgment or order is only reviewable if it directly relates back to the order or judgment sought to be reviewed). For these reasons, we find that this court lacks subject-matter jurisdiction over the March 1, 2016, and March 8, 2016, injunctions as part of this appeal.

¶ 70                    2. Jurisdiction Under the Guardianship Jurisdiction Act

¶ 71    We now turn to the orders properly before us in these consolidated appeals: the March 4, 2016, order adjudicating MaryLou to be disabled pursuant to section 11a-2 of the Probate Act (755 ILCS 5/11a-2 (West 2014)) and appointing Carol as plenary guardian pursuant to section to section 11a-12 of the Probate Act (755 ILCS 5/11a-12 (West 2014)) as well as the June 21, 2016, order denying MaryLou's motion to take judicial notice of the Texas judgment and terminate the guardianship. The threshold issue on appeal is whether the circuit court had jurisdiction, pursuant to the Guardianship Jurisdiction Act (755 ILCS 8/101 *et seq.* (West 2014)), to adjudicate MaryLou as a disabled person and to appoint a plenary guardian of her person and estate. We begin our analysis of this threshold issue with a statement of our standard of review, followed by a discussion of the relevant provision of the Guardianship Jurisdiction Act.

¶ 72    "We review a trial court's decision that it has subject matter jurisdiction *de novo*." *Keller v. Walker*, 319 Ill. App. 3d 67, 70 (2001). The Guardianship Jurisdiction Act provides that a court of this state has jurisdiction to appoint a guardian or issue a protective order[12] for a respondent under certain enumerated conditions, including in situations where this state is the

---

[12]Section 102 of the Guardianship Jurisdiction Act defines " 'guardian' " as "a person appointed by the court to make decisions regarding the person of an adult" and a " 'protective order' " as "an order appointing a conservator or other order related to management of an adult's property." 755 ILCS 8/102(3), (10) (West 2014). Here, the order at issue appointed Carol the guardian of MaryLou's person and estate and so operated as both a guardianship and protective order within the meaning of the Guardianship Jurisdiction Act.

respondent's "home state." 755 ILCS 8/203(1) (West 2014). " 'Home state' " is defined by the Guardianship Jurisdiction Act as follows:

"the state in which the respondent was physically present, including any period of temporary absence, for at least six consecutive months immediately before the filing of a petition for a protective order or the appointment of a guardian; or if none, the state in which the respondent was physically present, including any period of temporary absence, for at least six consecutive months ending within the six months prior to the filing of the petition." 755 ILCS 8/201(a)(2) (West 2014).

¶ 73    Here, when Carol filed her petitions for temporary and plenary guardianship over MaryLou on April 17, 2015, the record is clear that MaryLou was then physically present in Texas but had been physically present in Illinois for well over the six consecutive months ending within the six months prior to Carol's filing the petitions, having lived in Illinois her whole life prior to relocating to Texas "sometime after March 11, 2015." Accordingly, at the time Carol filed the petitions, Illinois was MaryLou's "home state" pursuant to section 201(a)(2) of the Guardianship Jursdiction Act (755 ILCS 8/201(a)(2) (West 2014)), and thus Illinois had jurisdiction to appoint a guardian over MaryLou's person and estate (*i.e.*, appoint a guardian and issue a protective order) at that time. 755 ILCS 8/203(1) (West 2014). The committee comments to section 203 of the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (Uniform Guardianship Act) make clear that once a petition is filed in the court of the respondent's "home state," that state does not cease to be the respondent's home state due to the passage of time even though it may be many months before an appointment is made or order issued. Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act § 203

Comment (Unif. Law Comm'n 2007).[13] Only upon dismissal of the petition can the court cease to be the home state due to the passage of time. *Id.* Here, the circuit court exercised jurisdiction as a court of MaryLou's home state by entering an order appointing Carol temporary guardian of MaryLou's person and estate on April 17, 2015, pursuant to section 11a-4 of the Probate Act (755 ILCS 5/11a-4 (West 2014)) and by entering the March 4, 2016, plenary order at issue on appeal. Section 205 of the Guardianship Jurisdiction Act (755 ILCS 8/205 (West 2014)) makes clear that once the circuit court has appointed a guardian or issued a protective order, it has exclusive and continuing jurisdiction over the proceeding until it is terminated by the court or the order expires by its own terms.

¶ 74    On February 26, 2016, a petition with respect to a guardianship and protective order over MaryLou was filed in the State of Texas. This petition triggered section 209 of the Guardianship Jurisdiction Act (755 ILCS 8/209 (West 2014)), which sets forth two rules that apply when a petition for the appointment of a guardian or the issuance of a protective order is filed in this state and in another state and neither petition has been dismissed or withdrawn. The first of these provides that if the court in this state has jurisdiction under section 203, it may proceed with the case unless a court in another state acquires jurisdiction under provisions similar to section 203 before the appointment or issuance of the order. 755 ILCS 8/209(1) (West 2014).[14] MaryLou, Michael, and Lynda all argue that this provision applies to divest the circuit court of jurisdiction. For the following reasons, we disagree.

¶ 75    Our review of pertinent Texas law reveals that it has not adopted the Uniform Guardianship Act and that its laws governing jurisdiction over guardianship proceedings is in no

---

[13]The Guardianship Jurisdiction Act (755 ILCS 8/101 *et seq.* (West 2014)) is based on the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (Unif. Law Comm'n 2007).

[14]Neither MaryLou nor Michael and Lynda argue that the second rule stated in section 209 of the Guardianship Jurisdiction Act (755 ILCS 8/209(2) (West 2014)) applies to divest the circuit court of jurisdiction, and our *sua sponte* review of the second rule leads us to conclude it is inapplicable.

way similar to section 203 of the Uniform Guardianship Act. Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act § 203 (Unif. Law Comm'n 2007). Pursuant to section 1023.001 of Vernon's Texas Estates Code Annotated (Tex. Est. Code Ann. § 1023.001 (West 2014)), "a proceeding for the appointment of a guardian for the person or estate, or both, of an incapacitated person shall be brought in the county in which the proposed ward resides or is located on the date the application is filed or in the county in which the principal estate of the proposed ward is located." There is nothing in the Texas law that connects jurisdiction over a proposed ward to location within the state for a specified period of time. We find that, at a minimum, some type of time requirement regarding a potential ward's presence within a state and/or connection to a state is required for a state's law to be "similar to Section 203 [of the Guardianship Jurisdiction Act]" such that section 209(1) of the Guardianship Jurisdiction Act (755 ILCS 8/209(1) (West 2014)) would apply to divest the circuit court of Illinois of jurisdiction. We decline to address specifically what residency and/or connection requirements a state that has not adopted the Guardianship Jurisdiction Act would need to have in place in order to be considered "similar" to section 203 of the Guardianship Jurisdiction Act (755 ILCS 8/203 (West 2014)) for purposes of section 209(1) of the Guardianship Jurisdiction Act (755 ILCS 8/209(1) (West 2014)). We hold only that the Texas law, which contains no such requirements whatsoever, cannot be so considered. As the comment to section 209 of the Uniform Guardianship Act makes clear, "[i]f a petition is brought in the respondent's home state, that court has jurisdiction over that of any significant-connection or other state." Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act § 209 Comment (Unif. Law Comm'n 2007). As previously explained, Illinois was MaryLou's "home state" at the time Carol filed her petitions, and the circuit court continues to have "home state" jurisdiction until that petition is

terminated or dismissed. Accordingly, the circuit court did not err in denying MaryLou's motion to dismiss for a lack of subject-matter jurisdiction.

¶ 76        3. Irregularities in the Procedures Employed Throughout the Proceedings

¶ 77    At the outset of our review of the circuit court's order appointing Carol as plenary guardian of MaryLou's person and estate, we are compelled to comment on the extensive deviation from the procedures set forth in the sections of the Probate Act concerning guardians for disabled adults (755 ILCS 5/11a-1 to 11a-24 (West 2014)) and the profound impact these deviations had on MaryLou's rights during a broad time frame of the proceedings during which she had not been adjudged disabled. We begin by noting that the guardianship provisions of the Probate Act are designed to ensure that a potential ward's rights are adjudicated in an expedited manner. This is seen in the requirement that a temporary guardianship not be extended beyond 120 days (755 ILCS 5/11a-4(b)(2) (West 2014)), as well as the requirement that upon the filing of a petition for guardianship, the court shall set a date and place for a hearing on the petition within 30 days. 755 ILCS 5/11a-10(a) (West 2014). Here, Carol's temporary guardianship over MaryLou was permitted to extend throughout the pendency of the proceedings, a time frame of nearly a year. During this time, a freeze was placed on MaryLou's access to funds and she was ordered that she could not leave the residence of a nursing home or choose her own caregiver. Although the timing requirements set forth above have been ruled to be directory (see *In re Estate of Doyle*, 362 Ill. App. 3d 293, 299 (2005)), this court is concerned about the impact the significant delay had on MaryLou's life during the pendency of these proceedings.

¶ 78    This court is further troubled by the fact that for the majority of the time the petition for guardianship over MaryLou was pending, and temporary guardianship extended, there was no physician's report on file as required by section 11a-9 of the Probate Act. 755 ILCS 5/11a-9

41

(West 2014). In response to MaryLou's motion to vacate the first temporary guardianship order that was entered, Carol filed Dr. Manger's report, which stated that MaryLou has end-stage dementia, but this report was withdrawn and MaryLou was required to submit to examination by a doctor of Carol's choosing. In the meantime, MaryLou filed two reports, that of Dr. Carolino and Dr. Kim, both stating that MaryLou had mild cognitive impairment but was not in need of a guardian. These were contained in the record in sealed envelopes that apparently were not opened until this court reviewed them in connection with this appeal. Once MaryLou was examined by Dr. Vest, his report was not placed on file, and in fact was not contained in the record on appeal until the circuit court ordered, almost four months after it entered the guardianship order, that the record be supplemented to include Dr. Vest's deposition, to which Dr. Vest's report was attached. In addition, Dr. Vest's report was deficient in several respects, in that it summarily determined, based on moderate cognitive deficit, that MaryLou needed a plenary guardian of her person and estate, without including many, or most of, the elements required of a report under section 11a-9(a) of the Probate Act. 755 ILCS 5/11a-9(a) (West 2014).

¶ 79    Perhaps most troubling was the circuit court's failure to procure an evidentiary statement by MaryLou regarding her preferences of caregiver and residence and the circuit court's utter disregard for the preferences that were communicated by MaryLou to the various witnesses in the case and through her attorney. Section 11a-12(d) of the Probate Act requires that the circuit court give due consideration to the preference of the disabled person as to a guardian. 755 ILCS 5/11a-12(d) (West 2014). Here, MaryLou requested to be excused from being present at the hearing, and the circuit court denied the request, contrary to section 11a-11(a), which provides for the potential ward to be excused upon the mere showing that she refuses to be present. 755 ILCS 5/11a-11(a) (West 2014). Pursuant to section 106 of the Guardianship Jurisdiction Act

(755 ILCS 8/106 (West 2014)), the circuit court on its own motion could have ordered that the testimony of a witness who is located in another state be procured by deposition or other means, including by telephone or other audiovisual or electronic means. Instead of employing these procedures, the circuit court chose to infer from a non-evidentiary statement, which the circuit court called an "outburst," by MaryLou that she "was not herself" and guessed that she would want to stay in Texas but quoted the Rolling Stones, saying "you can't always get what you want."

¶ 80   This court considered the possibility of ordering a new trial based on the cumulative impact of the aforementioned procedural irregularities, combined with our conviction, that the circuit court did not, in fact, review and/or consider the medical evidence in determining whether MaryLou was disabled. However, because this court does not wish to prolong these proceedings any further, leaving MaryLou's rights in limbo, we have elected to review the record to determine the propriety of the circuit court's order in light of the applicable legal standards and our standard of review.

¶ 81          4. Adjudication of Disability and Power to Appoint Guardian

¶ 82   Having outlined our deep concerns regarding the procedural irregularities that impacted MaryLou's rights and determined that we shall proceed to a review of the circuit court's order in light of the evidence in this case, we turn to the issue of whether the circuit court erred in adjudging MaryLou to be a disabled person requiring a plenary guardian of her person and estate. Section 11a-2(a) of the Probate Act (755 ILCS 5/11a-2(a) (West 2014)) defines disabled person, in relevant part, as a person who because of mental deterioration or physical incapacity is not fully able to manage her person or estate. Pursuant to section 11a-3(a) of the Probate Act, if

the court adjudges a person to be a disabled person as defined in section 11a-2 of the Probate Act (755 ILCS 5/11a-2 (West 2014)), the court may appoint as follows:

"(1) a guardian of [her] person, if it has been demonstrated by clear and convincing evidence that because of [her] disability [she] lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of [her] person, or (2) a guardian of [her] estate, if it has been demonstrated by clear and convincing evidence that because of [her] disability [she] is unable to manage [her] estate or financial affairs, or (3) a guardian of [her] person and of [her] estate." 755 ILCS 5/11a-3(a) (West 2014).

The clear and convincing evidence standard of proof has been defined as follows:

"Courts have defined 'clear and convincing' evidence most often as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995).

¶ 83    "Whether and to what extent a person needs a guardian is a factual determination to be made by the trial court and which a reviewing court may not reverse unless it is against the manifest weight of the evidence." *In re Estate of Silverman*, 257 Ill. App. 3d 162, 168-69 (1993). A decision is "against the manifest weight of the evidence only where the opposite conclusion is clearly evident, or where it is unreasonable, arbitrary[,] and not based on the evidence." *Ross v. Civil Service Comm'n*, 250 Ill. App. 3d 597, 600-01 (1993) (citing *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). With these standards in mind, we proceed to determine whether the circuit court erred in determining that MaryLou requires a plenary guardian of her person and her estate.

¶ 84                          a. *Guardianship of the Person*

¶ 85     As set forth above, the circuit court may appoint a guardian over the person if it has been demonstrated by clear and convincing evidence that because of her disability she lacks sufficient understanding or capacity to communicate responsible decisions concerning the care of her person. 755 ILCS 5/11a-3 (West 2014). This section clarifies that, although a person may be disabled in the statutory sense of not being fully able to manage her person, a disabled person could still direct others in such activity and therefore would not necessarily need a guardian over her person. *In re Estate of Fallos*, 386 Ill. App. 3d 831, 839 (2008). Accordingly, plenary guardianship of the person is not appropriate where the respondent is capable of " 'intelligently direct[ing]' others to perform tasks for [her]." *Id.* (quoting *In re Estate of McPeak*, 53 Ill. App. 3d 133, 136 (1977)). Again, it has been emphasized in the case law that a potential ward's inability to make or communicate decisions regarding the care of the ward's person must be proven by clear and convincing evidence, creating a relatively high standard to appoint a guardian of the person. *Id.* at 841 (citing Pub. Act 93-435, § 5 (eff. Jan. 1, 2004) (amending 755 ILCS 5/11a-3)). For the reasons that follow, we find that this standard was not met with respect to MaryLou's need for a guardian of her person.

¶ 86     The medical evidence in the record, including the doctors' reports, depositions, and medical records from the nursing homes of which MaryLou has been a resident, shows that MaryLou is at a point in her aging process where she requires round-the-clock care when it comes to her physical needs and safety. However, this does not mean that MaryLou lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of her person as is required for appointment of a guardian of her person. *Id.* The medical

evidence, at most, suggests that MaryLou suffers from mild to moderate decline in cognitive functioning. This has manifested in some short-term memory loss and periods of confusion.

¶ 87   Despite her short-term memory loss and periods of confusion, both doctors, and many of the other witnesses, testified that MaryLou was oriented to time and place. Imogene Harrell, who worked at St. Paul's during the time frame the circuit court determined that MaryLou became disabled, and who the circuit court specifically stated was credible, testified that MaryLou was capable of having intelligent, adult conversations and communicating her needs to the staff. In addition, Imogene testified that MaryLou voluntarily participated in her care. While MaryLou had some forgetfulness as to whether she had her bath or took her medication, her caregivers were able to provide adaptations by creating checklists and having MaryLou sign off so that she could be ensured these things occurred. Similarly, Keri Scheibel testified that MaryLou was always cooperative in therapy and able to communicate her desires. Although MaryLou expressed a desire to leave St. Paul's, there was testimony that the facility there was dilapidated and MaryLou was able to communicate her desire to discharge from St. Paul's and seek care elsewhere. There is no clear and convincing evidence in the record from which the circuit court could conclude that MaryLou's mild to moderate cognitive deficits, manifesting as short-term forgetfulness and periods of confusion, prevent MaryLou from communicating to others regarding her desires with respect to her living arrangements and the direction of her care. For these reasons, we reverse, without remanding, the circuit court's finding that MaryLou requires a guardian of her person.[15]

---

[15]We note that because we have reversed the circuit court's adjudication of Carol's petition as it relates to the guardianship of MaryLou's person, we need not remand to the circuit court because Carol's petition in that regard is terminated.

¶ 88                          b. *Guardianship of the Estate*

¶ 89    Having determined that the circuit court erred in determining that Carol proved, by clear and convincing evidence, that MaryLou requires a guardian of her person, we now proceed to review the evidence as it relates to guardianship of MaryLou's estate. Having extensively reviewed the record on appeal, we find that there is clear and convincing evidence that, due to her physical limitations, as well as mild to moderate cognitive impairment, MaryLou is unable to fully manage her sizeable estate. See 755 ILCS 5/11a-2(a), 11a-3(a)(2) (West 2014). The record is replete with evidence that MaryLou was confused about the location of her accounts and whether they were titled in her own name or jointly with Carol and/or Michael. There is also evidence from which it can be inferred that MaryLou was confused about how the villa was to be titled and the implications thereof. In addition, there is evidence that MaryLou had some confusion about the amount of money for which she sold her house, stating to attorney Baricevic that she sold it for "one and three hundred cents." Further, she told attorney Baricevic that she does sometimes need assistance managing her money. Finally, the evidence showed that prior to the initiation of these proceedings, Carol provided comprehensive assistance to MaryLou in the area of her finances. For these reasons, we affirm the circuit court's finding that MaryLou requires a guardian of her estate.

¶ 90    Although we affirm the circuit court's finding that MaryLou requires a guardian of her estate, we find that there is not clear and convincing evidence in the record as to whether MaryLou lacks merely some, or lacks all, capacity to manage her estate. Pursuant to section 11a-12(b) and (c) of the Probate Act (755 ILCS 5/11a-12(b), (c) (West 2014)), the circuit court is required to determine whether a limited guardianship would be appropriate based on the level of MaryLou's disability. We find the circuit court's conclusion that a plenary guardian is required

47

to be against the manifest weight of the evidence. There is no evidence in the record specifically outlining the extent to which MaryLou's mild to moderate cognitive deficit, manifesting in short-term memory loss and periods of confusion, specifically impairs her capacity to manage her financial affairs in practical terms. Section 11a-3(b) of the Probate Act requires that:

> "Guardianship shall be utilized only as is necessary to promote the well-being of the disabled person, to protect [her] from neglect, exploitation, or abuse, and to encourage development of [her] maximum self-reliance and independence. Guardianship shall be ordered only to the extent necessitated by the individual's actual mental, physical and adaptive limitations." 755 ILCS 5/11a-3(b) (West 2014).

¶ 91    Because we find that the record lacks evidence sufficient to adequately tailor the guardianship of MaryLou's estate to her specific mental, physical, and adaptive limitations, we vacate the circuit court's finding that a plenary guardianship is required, and remand for the limited purpose of an evidentiary hearing with respect to the exact parameters of the guardianship of MaryLou's estate that are necessary to effectuate the requirements of section 11a-3(b) of the Probate Act (*id.*), as outlined in section 11a-12(b) and (c) of the Probate Act. 755 ILCS 5/11a-12(b), (c) (West 2014). In so doing, the circuit court should set forth the specific parameters of the guardianship of MaryLou's estate with reference to the duties of the estate guardian, which are set forth in section 11a-18 of the Probate Act. 755 ILCS 5/11a-18 (West 2014). In addition, we instruct the circuit court that, should MaryLou so choose, she be permitted to be absent from the hearing pursuant to section 11a-11(a) of the Probate Act (755 ILCS 5/11a-11(a) (West 2014)), and that her testimony be procured through electronic or other means as set forth in section 106 of the Guardianship Jurisdiction Act. 755 ILCS 8/106 (West 2014).

¶ 92                                5. Selection of Guardian

¶ 93    Having determined, utilizing the applicable standard of proof and of review, that Carol proved only that MaryLou was in need of a limited guardian of her estate, we turn to the issue of the circuit court's naming of Carol as guardian. Section 11a-12(d) of the Probate Act (755 ILCS 5/11a-12(d) (West 2014)) provides as follows:

> "The selection of the guardian shall be in the discretion of the court, which shall give due consideration to the preference of the disabled person as to a guardian, as well as the qualifications of the proposed guardian, in making its appointment. However, the paramount concern in the selection of the guardian is the best interest and well-being of the disabled person."

¶ 94    The circuit court's decision as to whom to appoint as guardian is subject to an abuse of discretion standard of review on appeal. *In re Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 139. We will not find an abuse of discretion unless the circuit court's ruling was arbitrary, fanciful, or unreasonable, or unless no reasonable person would have taken the view adopted by the circuit court. *Id.* Because we have found that it has only been proven that MaryLou is in need of a limited guardian of her estate, we review the decision to appoint Carol as guardian in light of her suitability to serve in this capacity in particular.

¶ 95    In appointing a guardian of the estate of a ward, factors to be considered include the past actions, and conduct of the proposed guardian, business experience, ages, and family situations, as well as the degree of relationship between the disabled person and the guardian. *In re Schmidt*, 298 Ill. App. 3d 682, 690 (1998). In addition, serious consideration should be given to any conduct by the disabled person prior to the adjudication manifesting trust or confidence in the proposed guardian as well as prior conduct by the proposed guardian indicating a concern for the

49

well-being of the disabled person. *Id.* A person who is appointed by the court to act as the guardian of a disabled person's estate must be free from any interest which would prevent or impair the proper assertion or protection of the ward's rights. *In re Estate of Johnson*, 303 Ill. App. 3d 696, 708 (1999).

¶ 96    Here, Carol put on a great deal of evidence that prior to May 2015, she and her family were MaryLou's primary source of assistance and physical support. Carol was also substantially assisting MaryLou with her finances up to that time. However, the evidence shows that something happened in late 2014 into early 2015, which caused some kind of disagreement and/or miscommunication between Carol, MaryLou, and Michael concerning the titling of MaryLou's accounts and that this was the catalyst for MaryLou's move to Texas and the institution of these proceedings. There is evidence of large gifts by MaryLou to both Carol and her daughter, as well as to Michael, and allegations of undue influence and/or unfair dealing with respect to MaryLou's finances on the part of each sibling. This concerned attorney Skinner, the guardian *ad litem*, who stated that he was an advocate for appointing a third party to handle MaryLou's finances because it seemed like a lot of the problems between the parties revolved around money. It is also of great consideration that no matter the cause or source of MaryLou's feelings, the record expresses her strong and unequivocal desire that Carol not serve as guardian of her estate.

¶ 97    Section 11a-5(c) of the Probate Act (755 ILCS 5/11a-5(c) (West 2014)) provides that "[a]ny corporation qualified to accept and execute trusts in this State may be appointed guardian of the estate of a disabled person." We hold that under the circumstances of this case, enumerated above, the circuit court abused its discretion in not appointing such a third party to act as limited guardian of MaryLou's estate. Accordingly, we vacate that portion of the circuit

50

court's order appointing Carol as guardian and remand for proceedings in which the circuit court appoints a corporation pursuant to section 11a-5(c) of the Probate Act (*id.*) as guardian of MaryLou's estate, and as previously held, sets forth the exact parameters of that guardianship.

¶ 98    6. Order Denying MaryLou's Motion to Terminate Guardianship

¶ 99    We turn now to the final issue on appeal, which concerns MaryLou's April 13, 2016, motion to take judicial notice of foreign judgment and terminate adjudication of disability. In light of our finding that the circuit court had jurisdiction over Carol's petition with respect to the guardianship of MaryLou's person and estate under the Guardianship Jurisdiction Act (755 ILCS 8/101 *et seq.* (West 2014)), we find no prejudicial error with regard to the circuit court's failure to take judicial notice of the Texas judgment in the competing guardianship proceedings. With regard to any request by MaryLou to terminate the adjudication of disability, this court has been informed by the parties during the course of these proceedings that a superseding petition to terminate MaryLou's adjudication of disability was filed on July 19, 2016. Due to the superceding petition, we find any issue regarding the circuit court's failure to adjudicate MaryLou's previous petition to terminate is moot. However, we point the circuit court to section 11a-20 of the Probate Act (755 ILCS 5/11a-20 (West 2014)) and the standards set forth therein for considering MaryLou's petition to terminate and note that, in light of our opinion, MaryLou's petition should only be adjudicated as it pertains to the guardianship of her estate, as this court has held that Carol did not prove that MaryLou requires a guardianship of her person.

¶ 100    CONCLUSION

¶ 101    For the foregoing reasons, we reverse, without remanding, that part of the circuit court's March 4, 2016, order that found that MaryLou requires a guardian of her person. We affirm that part of the circuit court's order that found that MaryLou requires a guardian of her estate. We

51

vacate the remainder of the circuit court's order and remand to the circuit court for the limited purpose of an evidentiary hearing in which the circuit court appoints a corporation pursuant to section 11a-5(c) of the Probate Act (755 ILCS 5/11a-5(c) (West 2014)) as guardian of MaryLou's estate and imposes any limitations on that guardianship that should be imposed based on MaryLou's actual mental, physical, and adaptive limitations as set forth in sections 11a-3(b) and 11a-12(a) and (b) of the Probate Act (755 ILCS 5/11a-3(b), 11a-12(a), (b) (West 2014)), with reference to the duties of a guardian of the estate that are set forth in section 11a-18 of the Probate Act. 755 ILCS 5/11a-18 (West 2014). In addition, we instruct the circuit court that, should MaryLou so choose, she be permitted to be absent from the hearing pursuant to section 11a-11(a) of the Probate Act (755 ILCS 5/11a-11(a) (West 2014)), and that her testimony be procured through electronic or other means as set forth in section 106 of the Guardianship Jurisdiction Act. 755 ILCS 8/106 (West 2014). Finally, due to a superseding petition to terminate the guardianship, we find any issue regarding the circuit court's failure to rule on MaryLou's April 13, 2016, petition to terminate the guardianship is moot, but point the circuit court to section 11a-20 of the Probate Act (755 ILCS 5/11a-20 (West 2014)) and the standards set forth therein for considering MaryLou's petition to terminate, and note that, in light of our opinion, MaryLou's petition to terminate should only be adjudicated as it pertains to the guardianship of her estate.

¶ 102   Affirmed in part; reversed in part; vacated in part; remanded with directions.

2017 IL App (5th) 160129

NOS. 5-16-0129, 5-16-0132, 5-16-0292 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* ESTATE OF | ) | Appeal from the Circuit Court of |
| MARYLOU KUSMANOFF, | ) | St. Clair County. |
| an Alleged Disabled Adult | ) | |
| | ) | No. 15-P-246 |
| (Carol Easterley, Petitioner- | ) | Consolidated with |
| Appellee; Lynda Burgett, | ) | No. 15-CH-313 |
| Counterpetitioner-Appellant; | ) | |
| Michael Burgett, Interested | ) | |
| Person-Appellant; and MaryLou | ) | Honorable |
| Kusmanoff, Respondent- | ) | Stephen P. Rice, |
| Appellant). | ) | Judge, presiding. |

_____

**Opinion Filed:**      **August 29, 2017**

_____

**Justices:**      Honorable James R. Moore, P.J.

Honorable Thomas M. Welch, J., and
Honorable David K. Overstreet,
Concur

_____

**Attorneys for Appellants**      John L. Gilbert, Timothy C. Sansone, Sandberg Phoenix & von Gontard, P.C., 600 Washington Ave., 15th Floor, St. Louis, MO 63101 (attorneys for Lynda and Michael Burgett); Brian T. McCarthy, 2 Park Place Professional Centre, Belleville, IL 62226 (attorney for MaryLou Kusmanoff)

_____

**Attorneys for Appellee**      Jane Unsell, Unsell, Schattnik & Phillips, P.C., 3 South 6th Street, Wood River, IL 62095; Samantha Unsell, Keefe, Keefe & Unsell, P.C., #6 Executive Woods Court, Belleville, IL 62226-0216 (attorneys for Carol Easterley)

_____