2020 IL App (1st) 191490-U

SIXTH DIVISION
April 17, 2020

No. 1-19-1490

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF DEBORAH CHENG, | ) | |
| | ) | Appeal from the |
| (MARY RALEIGH, Guardian *Ad Litem*, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 18 P 5685 |
| DEBORAH CHENG, | ) | |
| | ) | |
| Defendant-Appellant), | ) | |
| | ) | Honorable |
| (Charles P. Golbert, Cook County Public Guardian, as | ) | Susan Kennedy-Sullivan, |
| Plenary Guardian of the Estate of Deborah Cheng, | ) | Judge Presiding. |
| Appellee). | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Harris concurred in the judgment.

## O R D E R

¶ 1     *Held*:  The circuit court's determination that respondent needed a guardian of the estate was not against the manifest weight of the evidence.

¶ 2     This appeal stems from the circuit court's appointment of a guardian of the estate for

respondent Deborah Cheng. On appeal, Deborah contends that the circuit court's finding that she

needed such a guardian was error because (1) the evidence that Deborah suffers from a mental illness was insufficient and lacked a medical basis and (2) the conclusion that Deborah was unable to manage her estate was unsupported by the testimony. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In March 2016, Deborah's father, Paul Cheng, passed away. In his estate plan, Paul provided for the division of his estate among his four adult children: Maria, Elizabeth, Deborah, and Samuel. Paul's will was admitted to probate in case No. 16 P 1789. Elizabeth, who was executor of her father's estate, requested that Deborah's portion be deposited into a special needs trust so that she would not lose the government benefits that she was receiving. Deborah objected and on January 10, 2018, Mary Raleigh was appointed by the judge overseeing Paul's estate to serve as guardian *ad litem* (GAL) for Deborah in that action.

¶ 5      On August 21, 2018, at the direction of the judge handling the probate of Paul's estate, Ms. Raleigh filed this case, a petition for the appointment of a guardian of the estate for Deborah. The petition alleged that Deborah had bi-polar and schizoaffective disorders and as a result was unable to manage her estate and financial affairs. In the petition, Ms. Raleigh requested that Deborah be adjudicated a person with a disability and that Charles P. Golbert of the Office of the Cook County Public Guardian (OPG) be appointed guardian of the estate for Deborah. Deborah objected to the petition for guardianship and the circuit court appointed independent counsel to represent her.

¶ 6      After a settlement conference failed to result in an agreement, the circuit court held a three-day hearing on the petition in February 2019. The GAL first called Kerry Hamill, an attorney with the OPG, who testified that if Deborah was found to be in need of a guardian of her estate, the OPG would accept that appointment and that there was a plan for Deborah's estate, which included Deborah's approximately $120,000 inheritance. Ms. Hamill testified that the OPG would set up a

trust so that the inheritance would not jeopardize Deborah's receipt of government benefits.

¶ 7    Two of Deborah's siblings—her brother Samuel Cheng and her twin sister Elizabeth Solomon—also testified at her hearing. Elizabeth testified that Deborah had "a long history of well-established mental health challenges," that Deborah was "diagnosed as schizophrenic as well as bipolar," and that "there was no progression that showed that she would ever be cured." Elizabeth also testified that she "believe[d] strongly" that a special needs trust was "the best way to take care of Deborah, to ensure she gets the care she needs and she's always in a safe environment." Elizabeth said that Deborah would be entitled to approximately $165,000 from their father's estate.

¶ 8    According to Samuel, Deborah graduated with a degree in industrial engineering from Northwestern University, then worked in Virginia near Washington, D.C., from 1996 until 2007. In 2007, Samuel said their oldest sister, Maria, was concerned about Deborah's health and went to visit Deborah. After the visit, Samuel learned that Deborah's living conditions were "not ideal": she had "saran-wrapped" her stove and countertops, she had no furniture beyond a table, and she slept in a sleeping bag with a comforter on the floor. Samuel explained that in the past, that was how the Cheng siblings had slept when they came home from college, as their parents had disposed of all their furniture.

¶ 9    Maria persuaded Deborah to return to Chicago with her. Once there, Deborah was admitted to the Tinley Park Mental Health Center (Tinley Park Center)—her first hospitalization. When Deborah was discharged from the Tinley Park Center, she moved in with her stepmother Alice, who was a nurse. While she lived with Alice, Deborah got a job working in a library.

¶ 10    In 2008, Deborah moved into her own apartment because she said she did not feel "normal" at Alice's house. Deborah spent $6000 to purchase new furniture for her home. Samuel described

this behavior as Deborah's attempt to show "this is me, I'm normal now because this is what everybody has. They have their own place, they have their own furniture." Samuel also testified that at some point after her first hospitalization, Deborah canceled her social security disability benefits.

¶ 11    Samuel further testified that in the fall of 2008, he picked up Deborah for Thanksgiving dinner at Alice's house. At dinner, Deborah said she was thinking about moving back to Virginia. Samuel tried to convince Deborah that this was not a good idea, but she was "adamant." Deborah stormed out of the house and sat on the curb, and "in desperation, [Samuel] called the police." When the police approached Deborah, she "reacted violently," which ultimately resulted in the police taking her to undergo a psychiatric evaluation. After the evaluation was completed at a hospital, when trying to figure out where Deborah could go, Deborah mentioned that she had previously been at the Tinley Park Center, "[s]o they took her there" for her second hospitalization.

¶ 12    In late 2009, a judge ruled that Deborah could leave the Tinley Park Center but required as a condition of her release that she stay at a group home for 90 days before returning to her normal life. When Deborah moved into the group home, Samuel made two visits to check on her. On his third visit, however, he learned that Deborah had left and moved back to Virginia.

¶ 13    In 2009, Deborah paid $68,000 to the Tinley Park Center for her stay there. Deborah explained to Samuel that she wanted to pay it back because "then it can be—my medical record can be expunged, and I can look normal. I could be normal." Elizabeth discussed the $68,000 payment with Deborah as well, and said that Deborah "was adamant she was not mentally ill; she needed to expunge her records because this was bad for her record, and she will never be able to get a job if this was on her permanent record. She felt that if she paid it back it w[ould] be expunged." Deborah also contacted attorneys to get her record "expunged."

4

¶ 14      Then in 2011, Deborah returned $42,000 to social security for her social security disability benefits. Elizabeth testified that Deborah again "claimed she was not ill. She was not mentally ill. The doctors had it all wrong. Every physician should be fired for saying she is mentally ill because she is not. She needed to expunge her medical records; and if she did not, she could not find other employment." Although Deborah paid back $42,000 to social security, she did not pay back all of benefits she received "because then she ran out of money."

¶ 15      Samuel and Elizabeth both started getting calls from Deborah, who was asking for money because she had been kicked out of her condo and needed a place to live. According to Samuel, "she was going from motel to motel. She was desperate. She was begging people." Elizabeth testified that Deborah was living on the street for a period of about three-and-a-half months. At some point, neither Samuel nor Elizabeth could continue to give Deborah money. Deborah's family discussed how to handle the situation and whether Deborah should return to Chicago. Deborah, however, insisted she would only move in with their father, Paul, who lived alone in Chicago. Their father was over 80 years old at the time, so Samuel thought the arrangement would be good for both Deborah and Paul. Samuel gave Deborah one of his credit cards, which he explained "allowed for you to use $50 without signing for it per month" so that Deborah could buy food for herself, instead of eating her father's food.

¶ 16      Samuel visited Deborah and Paul at least once every two weeks until the Chicago winter made regular visits difficult. He told Deborah to call if there was an emergency, and one Saturday he received a call from Deborah asking for help with their father. When Samuel arrived, he found their father unable to even get out of bed. Samuel drove Paul to the hospital where he learned his father was having trouble breathing and had issues with his heart. After Paul's hospitalization, the family moved him into a nursing home.

¶ 17    While Paul was in the nursing home, Samuel needed to get into Paul's condo to get the mail and help pay the bills, but Deborah refused to let him in. Samuel felt he had no choice but to call the police again. According to him, the police were "concerned about some of the responses" Deborah was giving, so they gave Samuel access to the condo while they took her to Weiss Hospital.

¶ 18    Deborah was discharged from Weiss Hospital to Read Mental Health Center (Read) for her third mental health hospitalization. Paul passed away while Deborah was at Read. During her stay there, Deborah also executed a power of attorney, naming Elizabeth as her agent, and Elizabeth helped Deborah reapply for social security disability.

¶ 19    Deborah was discharged from Read to Margaret Manor North, an independent care facility, now known as MADO Healthcare Buena Park, which we refer to here as MADO. Samuel visited Deborah at MADO and said that she was receiving higher doses of her medications, so he was "able to have conversations with her [and] take her out to eat." Samuel recommended to Deborah that she get a job, but she said that once their father's estate went through probate, she would have the money she needed to live on her own. Samuel explained to the court that this concerned him because "there's no way [Deborah could] just live on that money." Samuel took Deborah to McDonald's and Jewel to apply for jobs, but Deborah refused to fill out any applications because those jobs were "beneath her." Instead, she wanted an engineering job. Samuel and his wife helped Deborah buy a new suit and shoes for job interviews that "she constantly said she had," but then Deborah just "said that, oh, all these people—they didn't have jobs right now for [her], but [she] w[ould] get a job."

¶ 20    After he moved to the suburbs in 2018, Samuel stopped visiting Deborah, citing the hour-long drive to MADO from his home. As of the hearing, he had not seen Deborah for approximately

6

one year. Samuel said that Deborah has called him multiple times and sent him letters and that her discharge plan included moving in with him and his family. Samuel testified "there was no possible way" he could manage that. Samuel said he used to talk to Deborah on the phone "at least once a week" until she kept calling him when he was at work, and "every time she called [him], the conversation was pretty much the same thing." He now sends her calls to voicemail.

¶ 21    When asked how he was familiar with Deborah's finances, Samuel explained that Deborah gave him access to a checking account she had because she needed to maintain it above $2000 "or [she would] get penalized a fee every month." Deborah added Samuel to her account "so then [he] c[ould] bring the money above $2,000, keep it above there so she would not get penalized." Because Samuel still had access to the account, he knew there had been no withdrawals from it. Deborah also forwarded her mail to his address, so he received her bank statements. Samuel testified that he believed that Deborah had an IRA worth $25,000.

¶ 22    Elizabeth's understanding of Deborah's finances was that she received benefits from social security disability that were paid directly to MADO, and that Deborah otherwise had no income. Elizabeth was familiar with Deborah's finances because she had helped Deborah apply for social security disability benefits on two or three separate occasions. She testified that the last time Deborah was gainfully employed as an industrial engineer was 2007, and the last time she had full-time employment of any kind was in 2009, when she worked at a library for one year. Elizabeth also said that she believed if Deborah received her inheritance from their father's estate outright, that Deborah would "lose all of her social security benefits, disability benefits, and she will lose Medicaid as well."

¶ 23    Elizabeth, who lives in Washington state, acknowledged that she had not seen Deborah since 2016 when Deborah was at Read. Elizabeth explained that she called Deborah less and less

from 2016 to 2018 because they always discussed "the same topics." When asked what her most recent firsthand knowledge of Deborah's need for a guardian was, Elizabeth said it came from a counselor at MADO, and that she had most recently spoken to someone at MADO in October 2018. Elizabeth also testified that she had resigned as the holder of Deborah's power of attorney in 2018 and that she still had "minimum weekly emails from Deborah" and was aware of Deborah's state of mind as a result of those emails. Elizabeth explained that she supported the OPG serving as guardian of Deborah's estate because she wanted her sister to be safe and taken care of.

¶ 24    Dr. Shephali Patel, a board-certified psychiatrist who worked as a physician at MADO, testified that Deborah had been her patient since February 2017. Dr. Patel does "med management" with Deborah. They meet once per month for about 10 to 15 minutes. Dr. Patel explained that sometimes their meetings are shorter because "if Deborah does not like to hear what [she] ha[s] to say, [Deborah] will walk away." Dr. Patel did not know Deborah's highest level of education or her prior occupation.

¶ 25    Dr. Patel testified that Deborah has a mental illness called "schizoaffective disorder," "which is a chronic mental illness characterized by symptoms of schizophrenia and mood disorder." Dr. Patel said that Deborah also had "poor coping skills," explaining:

> "Deborah has difficulty because of her mental illness. She has a very difficult time acknowledging that she has a mental illness. She is in a state of denial that she has an illness, a mental illness. She is not able to cope with the stressors and she is not—she will not remain compliant with her medications. She can become very oppositional, very impulsive in her decision making skills and will just not listen to what I have to say."

¶ 26    Dr. Patel testified that Deborah's schizoaffective disorder affected her "mood, judgment,

thinking, and decision making skills," and her "problem solving skills, her organizational skills, [and] her emotional stability." Dr. Patel also testified that Deborah had lately exhibited "delusional thought processes" and was fixated on wanting to move out of MADO and that Deborah "says she is cured, she has no mental illness in spite of me telling her repeatedly that, no, you need to take your meds. She will only take meds what she wants to take."

¶ 27    Dr. Patel's conclusion was that Deborah was "[t]otally incapable of making personal and financial decisions" and, as for living arrangements, Dr. Patel "strongly recommend[ed] an intermediate care facility such as MADO."

¶ 28    Kaitlin Arnold, the clinical director at MADO, who at the time of her testimony had a master's degree in counseling psychology from Northwestern University and was "[o]n track" to become a licensed clinical professional counselor, testified that she had been at MADO for two-and-a-half years. During that time, she had interacted with Deborah frequently, seeing her about once or twice per week since Deborah's case manager left. The only discharge plan of Deborah's that Ms. Arnold knew of was that Deborah was hoping to move in with Samuel. Ms. Arnold stated that Deborah would voice that plan "[a]t least two or three times a week."

¶ 29    Ms. Arnold testified that Deborah was diagnosed with "[s]chizoaffective disorder, bipolar type," and agreed that Deborah's behaviors were consistent with that diagnosis. Ms. Arnold said that Deborah was most recently hospitalized "about a year ago" because she had become "very verbally aggressive" and "tried to jab [her case manager] with a pen" because the case manager asked Deborah to sign something she did not want to. In response to being asked whether Ms. Arnold had ever discussed Deborah's diagnosis of "schizoaffective bipolar" with Deborah, Ms. Arnold responded, "We have discussed different behaviors and symptoms that I am noticing, and she has not wanted to discuss those." Ms. Arnold said that Deborah was prescribed medications

but did not take them.

¶ 30    Ms. Arnold explained that, after living at MADO for 60 days, all clients are offered services through the "Moving On Program," which involves being "assessed by Lutheran Social Services of Illinois to see if they meet initial eligibility requirements to move out with the community agency." Ms. Arnold said that they "help in setting up the communication" between clients and the community agencies, "helping with any community living skill that they think would be helpful, and aiding in that process to move out into more independent housing." Deborah, however, had not expressed interest in participating in that program. Ms. Arnold also verified that Deborah received both Medicare and Medicaid and had never paid for her care or services at MADO privately.

¶ 31    The GAL attempted to call Deborah as an adverse witness. The court sustained an objection to this by Deborah's attorney. The GAL then rested her case and the court denied Deborah's motion for a directed verdict. Before resting, Deborah's counsel introduced one exhibit, her medical records from MADO.

¶ 32    On March 19, 2019, the circuit court issued a nine-page, single-spaced written order granting the petition for guardianship of the estate. The court noted that Deborah denied having a mental illness, had been hospitalized three times due to her mental illness since 2007, was most recently hospitalized in 2016, had not been employed since 2009, was "confident, falsely, she would move in with a family member," was adamant that she could handle her own money, had not acknowledged her dependency on social security disability payments, did not make sound financial decisions when she moved to her own apartment, and used her savings to "pay back government benefits to expunge her record but never confirmed whether her repayment met her goal." The court also noted the evidence in Deborah's favor, including that she is intelligent and

had an impressive academic career, and that she moved to her own apartment in 2008 and furnished it with her own money,

¶ 33    The court cited the evidence and exhibits showing that, since 2007, Deborah has been unable to handle her own financial affairs because of her mental illness. This included the fact that Elizabeth applied for social security benefits on Deborah's behalf in 2007, and helped her reapply again in 2009 after Deborah returned $68,000 to Illinois and $42,000 to the federal government in an attempt to "expunge" her record related to her need for social security disability. The court also noted that Deborah was evicted and became homeless for a period of time; that she sought financial support from her siblings while she was homeless but did not seek employment; that Deborah continued to deny that she received social security, Medicare, and Medicaid benefits, although she received all three; that she did not seem to understand that benefits were enabling her to stay at MADO; and that Deborah had not held a job—except briefly in 2009—in 11 years.

¶ 34    Finally, the court stated that it had found, by clear and convincing evidence, that because of her mental illness, Deborah "is not able to weigh the pros and cons of managing her inheritance." The court encouraged Deborah "to seek restorations should circumstances change for her" after again noting her "impressive education" and "successful life prior to her disability." The court appointed the OPG as the guardian of Deborah's estate.

¶ 35    The parties appeared before the circuit court again on June 24, 2019, on Deborah's motion to reconsider. The GAL informed the court that Deborah was no longer living at MADO and was presently "living in the community." The court asked Deborah if she had participated in "the move out plan," and though Deborah said she had, both the GAL and Deborah's counsel interjected, explaining that Deborah had, in fact, "left abruptly" and signed herself out against medical advice.

¶ 36    The circuit court denied Deborah's motion to reconsider. Deborah then asked the court for five minutes to speak, insisting that the court not interrupt her. The court allowed Deborah to speak on the record, during which she spoke at some length about her "gene of longevity," telling the court that she intended to make history. This appeal followed.

¶ 37                                  II. JURISDICTION

¶ 38    Deborah timely filed her notice of appeal on July 18, 2019. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 39                                  III. ANALYSIS

¶ 40    On appeal, Deborah argues that the circuit court erred in granting the GAL's petition for guardianship of Deborah's estate because (1) the evidence that Deborah suffers from mental disorders was "meager" and lacked a medical basis, and (2) the evidence did not support the conclusion that Deborah's mental status inhibits her ability to manage her estate. For the following reasons, we reject both of Deborah's arguments.

¶ 41    Section 11a-3 of the Probate Act of 1975 (Act) (755 ILCS 5/11a-3 (West 2018)) provides that a court may adjudge a person to be a person of disability if, "[u]pon the filing of a petition by a reputable person ***, but only if it has been demonstrated by clear and convincing evidence that the person [to be so adjudged] is a person with a disability as defined in Section 11a-2." Specifically, with respect to appointing a guardian of the estate, it must be "demonstrated by clear and convincing evidence that because of his disability he is unable to manage his estate or financial affairs." *Id.* Section 11a-2 of the Act defines a "Person with a disability" as "a person with mental illness *** who because of his mental illness *** is not fully able to manage his person or estate." *Id.* § 11a-2.

12

¶ 42    Our supreme court has defined "clear and convincing evidence" as:

"[T]he quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree or proof necessary to convict a person of a criminal offense." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995).

¶ 43    "Whether and to what extent a person needs a guardian is a factual determination to be made by the trial court and which a reviewing court may not reverse unless it is against the manifest weight of the evidence." (Internal quotation marks omitted.) *In re Estate of Kusmanoff*, 2017 IL App (5th) 160129, ¶ 83. "A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or where it is unreasonable, arbitrary[,] and not based on the evidence." (Internal quotation marks omitted.) *Id.*

¶ 44    The circuit court's appointment of a guardian of estate for Deborah in this case was not against the manifest weight of the evidence. Indeed, the evidence fully supported the circuit court's findings both as to the fact that Deborah suffered from a disability and that this disability left her unable to manage her financial affairs.

¶ 45    Dr. Patel testified that Deborah suffered from schizoaffective disorder, was delusional, and had "very limited" insight. Dr. Patel also testified that Deborah was "fixated" on moving out of MADO. Despite this fixation, Ms. Arnold testified that Deborah's only discharge plan was moving in with her brother Samuel—which Samuel testified could not happen. Ms. Arnold further testified that Deborah had not participated in the Moving On Program, which would have provided her with services to help her become independent. Ms. Arnold also testified that Deborah's behavior was consistent with her diagnosis of "schizoaffective disorder, bipolar type." In addition, Ms. Arnold

testified that Deborah's stay at MADO was not paid for by Deborah but by Medicare and Medicaid, though Deborah denied receiving any benefits.

¶ 46     Although Deborah's testifying siblings acknowledged that they had not seen Deborah recently, we agree with the GAL that their testimony also supported the court's findings. Both Deborah's brother Samuel and her sister Elizabeth testified that Deborah suffered from a chronic mental illness since 2007. Their testimony also supported the GAL's position that Deborah needed someone to help manage her estate. Deborah's siblings testified that Deborah had not worked since 2009 and had asked for and received financial assistance from them multiple times. Deborah repaid $68,000 to the Tinley Park Center in 2009 and $42,000 to social security in 2011, in an apparent attempt to "expunge" her medical records and "look normal." Before Deborah's recent return to Chicago from Virginia, she was homeless and begging for money. When Samuel suggested to Deborah that she should get a job, Deborah said that she would have the money to live on her own from their father's estate. These actions demonstrate Deborah's past inability to make sound financial decisions.

¶ 47     None of this evidence was refuted. In fact, the only suggestion that Deborah understood how to manage money came from her attorney, who said that Deborah knew that after 3 p.m. she could get two doughnuts for $.79 at Jewel. Considering all of the evidence, we cannot say that the circuit court's appointment of a guardian of the estate for Deborah was unreasonable, arbitrary, or not based on the evidence, or that the opposite conclusion was clearly evident. *Kusmanoff*, 2017 IL App (5th) 160129, ¶ 83.

¶ 48     Deborah's arguments to the contrary are simply not persuasive. Deborah argues that the evidence that she suffers from a mental illness "is meager and lacks a medical basis." Dr. Patel's testimony that Deborah suffers from schizoaffective disorder, bipolar type, was uncontradicted

and supported by testimony about Deborah's behavior from other witnesses, such as Ms. Arnold and her siblings. The medical records from MADO that Deborah entered as an exhibit at the hearing further support the conclusion that she suffers from a chronic mental illness. This evidence, taken together, is more than sufficient to present and clear and convincing picture that Deborah suffers from a mental illness.

¶ 49    Deborah relies on *In re Estate of McPeak*, 53 Ill. App. 3d 133 (1977), to support her argument that the medical evidence presented at her hearing was insufficient. In *McPeak*, the court noted that the respondent suffered from a "weakening of vigor, skill, and acuity which is a normal concomitant to advanced years," and "a heart ailment and shortness of breath." *McPeak*, 53 Ill. App. 3d at 136. The court then found that the record was "barren" of any evidence to suggest that the respondent was not capable of taking care of herself or her affairs. *Id.* In contrast here, however, Deborah is in her 40s and suffers from a chronic mental illness that is hardly concomitant to her current stage of life.

¶ 50    Deborah argues that Dr. Patel's testimony was "limited and unreliable" and did not go directly to Deborah's ability to manage her finances. The circuit court itself noted in its written ruling that Dr. Patel's testimony was limited and we acknowledge the same—Dr. Patel interacted with Deborah primarily for medication management. But as Deborah's psychiatrist, Dr. Patel could certainly testify as to Deborah's diagnosis and that diagnosis was supported by other testimony.

¶ 51    Deborah's second argument is that the manifest weight of the evidence did not show that she was unable to manage her financial affairs. However, this argument is based on her insistence that we should disregard her siblings' testimony. We cannot do that. "Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses." *In re Estate of Michalak*,

15

404 Ill. App. 3d 75, 96 (2010). "A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given the evidence, or the inferences to be drawn." *In re D.F.*, 201 Ill. 2d 476, 499 (2002).

¶ 52    Deborah stresses that her siblings had not seen her recently at the time of the hearing. However, the circuit court acknowledged that and stressed that they did observe her behavior for a number of years, and that this same delusional behavior was still occurring, as reported by Ms. Arnold at MADO. Deborah also argues that Elizabeth was operating under a conflict of interest because she was both the executor of their father's estate and the holder of Deborah's power of attorney. Deborah does not explain why this would undermine Elizabeth's credibility. Elizabeth testified, without contradiction, that she has been motivated throughout by her concern for her sister's welfare. Moreover, none of the history that Elizabeth recounted was contradicted and much of it is confirmed by other testimony. Deborah points out that Elizabeth signed an affidavit in the probate case in 2017 saying that Deborah was under no legal disability. First, we note that the affidavit seems to have been technically correct—based on the record before us, Deborah had not been adjudged legally disabled in 2017. Moreover, even if the affidavit were incorrect, it's only possible relevance is to Elizabeth's credibility as a witness. The circuit court clearly found Elizabeth to be credible and we give deference to that finding. In light of all of the evidence, the court's finding that Deborah needed a guardian to manage her estate was not against the manifest weight of the evidence.

¶ 53                                  VI. CONCLUSION

¶ 54    Because Deborah was shown to be a person with a disability by clear and convincing evidence, and because the circuit court's determination that she requires a guardian of the estate was not against the manifest weight of the evidence, we affirm the judgment of the circuit court.

While we affirm, we echo the statement of the circuit court that should Deborah's circumstances change, she should seek restoration of her right to control her financial affairs.

¶ 55    Affirmed.